GEORGIA AQUARIUM, INC., Plaintiff,

v.

Penny PRITZKER, in her Official Capacity as Secretary of Commerce, National Oceanic and Atmospheric Administration, and National Marine Fisheries Service, Defendants,

Animal Welfare Institute, Whale and Dolphin Conservation, Whale and Dolphin Conservation, Inc. (North America), Cetacean Society International, and Earth Island Institute, Intervenor–Defendants.

Civil Action No. 1:13–CV–3241–AT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed Sept. 28, 2015.

1282

George John Mannina, Jr. (argued), Ashley J. Remillard, Nossaman, LLP; Daniel Francis Diffley, Meaghan Goodwin Boyd, Alston & Bird, LLP, for Plaintiff Georgia Aquarium, Inc.

Clifford Eugene Stevens, Jr. (argued), U.S. Department of Justice; Lisa D. Cooper, Lori M. Beranek, U.S. Attorney's Office, Northern District of Georgia, for Federal Defendants.

Tyler Joseph Sniff (argued), Donald D.J. Stack, Stack & Associates, P.C., for Intervenor–Defendants Animal Welfare Institute, Whale and Dolphin Conservation, Whale and Dolphin Conservation, Inc. (North America), Earth Island Institute, Inc., and Cetacean Society International, Inc.

***ORDER***

AMY TOTENBERG, District Judge.

*"The oceans deserve our respect and care, but you have to know something*

*before you can care about it."* This quotation from Dr. Sylvia Earle,[1] the former chief scientist of the National Oceanic and Atmospheric Administration, is inscribed on the entry wall of the Georgia Aquarium's Ocean Voyager exhibit. Georgia Aquarium is before this Court on an administrative appeal of the denial of its application for a permit under the Marine Mammal Protection Act to import eighteen beluga whales from Russia for use in a United States breeding cooperative and for public display.

The Aquarium, as the applicant for a permit under the MMPA, bears the burden of showing that it satisfied the necessary criteria for issuance under the Act and that its requested import is consistent with the statute's protective purposes. Enacted in light of the grave uncertainties as to whether marine mammal populations are in danger of extinction or depletion as a result of man's activities, the House Committee report on the MMPA notes:

> In the teeth of this lack of knowledge of specific causes, and of the certain knowledge that these animals are almost all threatened in some way, it seems elementary common sense to the Committee that legislation should be adopted to require that we act conservatively—that no steps should be taken regarding these animals that might prove to be adverse or even irreversible in their effects until more is known.

*Comm. for Humane Legislation, Inc. v. Richardson,* 414 F.Supp. 297, 309 (D.D.C. 1976), *aff'd,* 540 F.2d 1141, 1148 (D.C.Cir. 1976) (citing H.R.Rep. No.92–707, at 15, 1972 U.S.C.C.A.N. 4148.)

Defendants denied the permit because the Aquarium failed in its burden under the Act to demonstrate that salient statutory and regulatory criteria necessary to issue the permit had been met. In essence, there were too many material *unknowns* about the potential negative impacts of the removal of these beluga whales from the wild left open by the Aquarium's permit application, despite their significance to the required criteria for permitting.

## Background

On June 15, 2012 Georgia Aquarium submitted an application to the National Marine Fisheries Service ("NMFS" or "the Agency") under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 *et seq.,* for a permit to import eighteen beluga whales from Russia for public display. Georgia Aquarium sought to import the beluga whales "to enhance the North American beluga breeding cooperative by increasing the population base of captive belugas to a self-sustaining level and to promote conservation and education." (Permit Application, AR 8927 at 14283.) The whales were previously captured and collected in the Sakhalin Bay of the Sea of Okhotsk[2] in 2006, 2010, and 2011 by a team led by Dr. Lev Mukhametov, Director of Utrish Dolphinarium, Ltd. (*Id.* at 10, 12.) Since their capture, the whales have been held at the Utrish Marine Mammal Research Station (UMMRS) on the Russian coast of the Black Sea. Upon arrival in the U.S., the whales would be distributed among six different aquaria facilities including the Georgia Aquarium in Atlanta, Sea World Orlando, Sea World San Antonio, Sea World San Diego, Mystic Aquarium, and Shedd Aquarium pursuant to breeding loans. (AR 8927 at 14444.)

Following a lengthy notice and comment period, Georgia Aquarium's hopes were

1. Dr. Earle has joined other marine mammal conservationists in submitting an amicus brief in this litigation opposing Georgia Aquarium's permit.

2. *See* Appendix A to this Order, "Figure 1 Sea of Okhotsk," AR 8927 at 14317.

sunk on August 5, 2013, when NMFS denied Georgia Aquarium's permit application. At the outset of its "Findings and Considerations" in support of the denial of Georgia Aquarium's permit, NMFS states:

> In reviewing this application through the lens of the purposes of the MMPA, we must consider the environmental impacts of the importation of these 18 beluga whales—not only the effects on the individual marine mammals, but also the current and future effects to the ecosystem from which they were collected. According to statutory and regulatory language, it is the applicant's responsibility, not that of NMFS, to demonstrate that the MMPA criteria have been met. This is outlined specifically in the statute at Section [1374](d)(3), which states a permit applicant "must demonstrate to the Secretary that the taking or importation of any marine mammal under such permit will be consistent with the purposes of this Act," and in the regulations at 216.34, which states that "the applicant must demonstrate that" the proposed activities satisfy the statutory and regulatory criteria. NMFS' review and consideration of the ongoing beluga capture operation and the information available regarding the population status in the Sea of Okhotsk indicates that the requested action is not consistent with the purposes of the MMPA and NMFS' implementing regulations.

(AR 8998 at 17421.)

NMFS cited three reasons why Georgia Aquarium's application failed to satisfy the MMPA's permit issuance criteria. First, NMFS determined that Georgia Aquarium did not demonstrate that the proposed import "by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock" in accordance with 50 C.F.R. § 216.34(a)(4):

> We cannot discount the likelihood that total removals from this stock have exceeded the total net production on an annual basis resulting in a small, but steady and significant decline over the past two decades. Further, the ongoing live-capture trade since 1989 may have contributed to a cumulative decline over the past two decades, and we considered this in combination with other past, present, and foreseeable future actions. Therefore, we are unable to make the determination that the proposed activity, by itself or in combination with other activities, would not likely have had a significant adverse impact on the species or stock.

(AR 8998 at 17440.)

Second, NMFS denied the permit application because Georgia Aquarium did not demonstrate that the proposed import would not likely result in the taking of marine mammals beyond those authorized by the proposed permit in accordance with 50 C.F.R. § 216.34(a)(7):

> We have determined that the requested import will likely result in the taking of marine mammals beyond those authorized by the permit. There are ongoing, legal marine mammal capture operations in Russia that are expected to continue, and we believe that issuance of this permit would contribute to the demand to capture belugas from this stock for the purpose of public display worldwide, resulting in the future taking of additional belugas from this stock.

(AR 8998 at 17440.)

Third, NMFS found that Georgia Aquarium did not demonstrate that some of the whales proposed for importation were not nursing at the time of taking in accordance with 16 U.S.C. § 1372(b)(2) and 50 C.F.R. § 216.12(c):

> We have determined that five of the [18] beluga whales proposed for import, estimated to be approximately 1.5 years old at the time of capture, were potentially

still nursing and not yet independent [of their mothers]. This would only result in the inability to import these five specific animals, if not for the other criteria that [Georgia Aquarium] did not meet.

(AR 8998 at 17440.)

On September 30, 2013, Georgia Aquarium filed this appeal, pursuant to the Administrative Procedures Act ("APA"), asserting that NMFS's permit denial was arbitrary, capricious, and not in accordance with the law. The parties have briefed the issues on appeal through cross-motions for summary judgment [Docs. 55, 59, & 61]. The Court reviewed the hefty administrative record and heard oral argument on August 14, 2015.

## I. Parties

Plaintiff Georgia Aquarium Inc. is a private 501(c)(3) corporation that operates an aquarium in Atlanta, Georgia that is open to the public and which offers education and conservation programs regarding marine mammals and other aquatic life.

Defendants include: (1) Penny Pritzker, the current Secretary of Commerce, sued in her official capacity, responsible for overseeing the proper administration and implementation of the MMPA; (2) National Oceanic and Atmospheric Administration ("NOAA"), an agency of the United States Department of Commerce with supervisory responsibility for the National Marine Fisheries Service, which has been delegated responsibility to ensure compliance with the MMPA; and (3) National Marine Fisheries Service ("NMFS"), an agency of the United States Department of Commerce that has been delegated primary responsibility to ensure compliance with the MMPA within the Department of Commerce. The Court refers to Defendants collectively herein as NMFS or "the Agency."

On April 18, 2014 the Court permitted the following five nonprofit organizations to intervene as Defendants in support of NMFS: Animal Welfare Institute, Whale and Dolphin Conservation, Whale and Dolphin Conservation, Inc. (North America), Cetacean Society International, and Earth Island Institute. Members from these groups submitted comments to Georgia Aquarium's permit application during the administrative public notice and comment period. The Court will refer to these parties herein as Intervenor–Defendants.

## II. Motions for Leave of Amici Curiae

On March 23, 2015 two groups of individuals and organizations separately filed motions for leave to file briefs as amici curiae in opposition to Georgia Aquarium's summary judgment motion: (1) Defenders of Wildlife and The Humane Society of the United States, [Doc. 63]; and (2) Kim Basinger, David Blaine, Jean–Michel Cousteau, Gabriela Cowperthwaite, Shannen Doherty, Dr. Sylvia Earle, Tim Eichenberg, Dr. Jane Goodall, Dr. Denise Herzing, Dr. Janet Mann, Dr. Lori Marino, Edward Norton, Hayden Panettiere, Louie Psihoyos, Fisher Stevens, Bob Talbot, Charles Vinick, Ingrid Visser and Dr. Masha Vorontsova (collectively referring to themselves as "the Conservationists"), [Doc. 66]. These motions are pending before the Court.

An amicus is a "friend of the court." *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1249 n. 34 (11th Cir.2006). Although there is no formal rule governing the filing of amicus curiae briefs, district courts possess the inherent authority to grant or refuse leave to amicus parties. *Id.* Courts typically grant amicus status where the parties "contribute to the court's understanding of the matter in question" by proffering timely and useful information. *Conservancy of Southwest Florida v. U.S. Fish and Wildlife Serv.*, No. 2:10–cv–106, 2010 WL 3603276 at *1 (M.D.Fla. Sept. 9, 2010)

(citing *Harris v. Pernsley,* 820 F.2d 592, 603 (3rd Cir.1987)).

As organizations and individuals with extensive experience in wildlife conservation, the amicus parties contend that their briefs may be useful to this Court by providing a unique perspective on the broader implications of importation and captive display, along with a scientific and legal context for the principles underpinning the MMPA. Georgia Aquarium disagrees. The Aquarium opposes the motions filed by the amicus parties, asserting (1) their participation is not appropriate because the amicus briefs are not relevant or useful to the court; (2) the amicus briefs present nothing more than the personal, political opinions of the parties, all of whom oppose public display generally; and (3) allowing their participation is akin to expanding the public comment period and supplementing the administrative record.

After reviewing the proposed amicus briefs, this Court finds that the information proffered by the amici is both timely and useful. NMFS was tasked with determining whether Georgia Aquarium's permit complied with the MMPA. Accordingly, information related to the scientific and legal context of the principles underpinning the MMPA is highly relevant to this Court's analysis. For these reasons, the Court **GRANTS** both motions for leave [Docs. 63 & 66] and has considered their briefs in its analysis.

## III. Timeline

The following table summarizes the timeline of events relevant to this administrative appeal:

| DATE | EVENT |
|---|---|
| 2006–2011 | • 18 beluga whales at issue were captured from the Sakhalin Bay of the Sea of Okhotsk a team led by Dr. Lev Mukhametov, Director of Utrish Dolphinarium, Ltd. |
| 6/15/2012 | • Georgia Aquarium submits MMPA application for import of 18 beluga whales from Russia |
| 7/18/2012 | • NMFS Permits Division determined application to be complete after some revision/supplementation |
| 8/30/2012–10/29/2012 | • Public notice and comment period (hearing held on 10/12/2012) |
| 10/29/2012 | • Marine Mammal Commission provides recommendations and concerns on permit approval |
| 1/28/2013–7/2013 | • Agency decision-making process |
| 1/28/2013 | • NMFS briefs Acting Administrator (AA) on public comments received |
| 2/2013–3/2013 | • NMFS reviews and incorporates public comments into draft Environmental Assessment (EA), reviews permit to determine whether to grant as proposed or modify, considers granting permit with 30 year moratorium on imports of beluga whales for public display |
| 3/8/2013 | • NMFS briefs Acting Administrator (AA) on status of permit review: NMFS makes preliminary findings that permit application was consistent with MMPA issuance criteria along with a 30 year moratorium but subsequently determines that preliminary findings are flawed (and no moratorium can be imposed by agency which must review each permit application on its own merits) and reconsiders (1) whether permit would result in significant adverse impact based on those flaws and available information and (2) whether import would result in additional takings beyond those authorized under the permit without implementation 30 year moratorium on beluga imports |
| 4/2013 | • NMFS begins drafting permit recommendation memo describing whether each MMPA criteria has been met<br>• NMFS determines additional questions remained regarding whether application met MMPA criteria, including whether any of the whales were nursing at the time of their capture |

| | |
|---|---|
| 4/3/2013 | • NMFS Chief of Permits and Conservation Division meets with Deputy AA to discuss ongoing concerns in available information and highlighted problems making the required findings under the MMPA |
| 4/9/2013 | • NMFS provides summary to AA of determination NMFS was having difficulty making under MMPA. NMFS decides to move forward with a recommendation to deny permit |
| 5/2013–7/2013 | • NMFS Chief of Permits and Conservation Division documents determination in recommendation memo/decision document. NFMS finalizes EA. |
| 8/5/2013 | • NMFS issues letter and decision to deny permit |
| 9/30/2013 | • Georgia Aquarium files administrative appeal in this Court |

## Standard of Review

The applicable standard under the APA is whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Defenders of Wildlife v. U.S. Dept. of Navy,* 733 F.3d 1106, 1114–1115 (11th Cir.2013).[3] An agency action may be found arbitrary and capricious:

> where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Miccosukee Tribe of Indians of Florida v. United States,* 566 F.3d 1257, 1264 (11th Cir.2009) (quoting *Alabama–Tombigbee Rivers Coal. v. Kempthorne,* 477 F.3d 1250, 1254 (11th Cir.2007)).

"The arbitrary and capricious standard is 'exceedingly deferential.'" *Defenders of Wildlife,* 733 F.3d at 1115 (citing *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541 (11th Cir.1996)).

> To determine whether an agency decision was arbitrary and capricious, the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' ***'This inquiry must be 'searching and careful,' but 'the ultimate standard of review is a narrow one.'*** Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal; '[a]dministrative decisions should be set aside in this context ... only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached.' The agency must use its best judgment in balancing the substantive issues. The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action.

*Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541–42 (11th Cir.1996) (quoting *North Buckhead Civic Ass'n v. Skinner,* 903 F.2d

3. Contrary to Georgia Aquarium's assertion in its Reply, this case is not subject to the substantial evidence standard in 5 U.S.C. § 706(2)(E). NMFS's permit denial decision is an informal adjudication subject to 5 U.S.C. § 706(2)(A). *See In re Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig.,* 818 F.Supp.2d 240, 260 n. 15 & 16 (D.D.C.2011) *aff'd sub nom. In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.-MDL No. 1993,* 720 F.3d 354 (D.C.Cir.2013) *and aff'd sub nom. In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.-MDL No. 1993,* 516 Fed.Appx. 5 (D.C.Cir.2013).

1533, 1538–40 (11th Cir.1990) (footnotes and citations omitted)) (emphasis added).

In determining whether the agency acted arbitrarily and capriciously, the Court must ask whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers,* 781 F.3d 1271, 1288 (11th Cir.2015) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The Court is not authorized to substitute its judgment for the agency's as long as the agency's conclusions are rational. *Defenders of Wildlife,* 733 F.3d at 1115 (citing *Miccosukee Tribe of Indians of Florida v. United States,* 566 F.3d 1257, 1264 (11th Cir.2009)); *Sierra Club v. Van Antwerp,* 526 F.3d 1353, 1360 (11th Cir.2008); *Pres. Endangered Areas of Cobb's History, Inc. ("PEACH") v. U.S. Army Corps of Eng'rs,* 87 F.3d 1242, 1246 (11th Cir.1996) ("The court's role is to ensure that the agency came to a rational conclusion, 'not to conduct its own investigation and substitute its own judgment for the administrative agency's decision.'"). While the Court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned ... [it] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Black Warrior Riverkeeper,* 781 F.3d at 1288 (internal citations omitted).

The Court has limited discretion to reverse an agency's decision when it "is making predictions, within its area of special expertise, at the frontiers of science ... as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *Defenders of Wildlife v. Bureau of Ocean Energy Mgmt.,* 684 F.3d 1242, 1248–49 (11th Cir.2012) (quoting *Miccosukee Tribe of Indians,* 566 F.3d at 1264 (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983))).

## MARINE MAMMAL PROTECTION ACT ("MMPA") AND IMPLEMENTING REGULATIONS

### I. Purpose of the MMPA

The MMPA was enacted to protect marine mammal species and population stocks in the wild that are or may be "in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1) (enumerating the congressional findings and policies intended to be served by the Act); *Florida Marine Contractors v. Williams,* 378 F.Supp.2d 1353, 1356 (M.D.Fla.2005); *Kanoa Inc. v. Clinton,* 1 F.Supp.2d 1088, 1093 (D.Haw.1998) (noting that the MMPA was enacted to ensure the protection and conservation of marine mammals). The stated purposes of the MMPA are:

(a) to prevent marine mammals species and population stocks [4] from "diminish[ing] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, [and] below their optimum sustainable population," and

(b) to protect and encourage development of the species and stocks "to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem" with "the goal to obtain an optimum sustainable population...." 16 U.S.C. §§ 1361(2) & (6); *see also, e.g.,*

4. A "population stock" or "stock" is "a group of marine mammals of the same species or smaller taxa in common spatial arrangement, that interbreed when mature." 16 U.S.C. § 1362(11).

*Florida Marine Contractors,* 378 F.Supp.2d at 1356; *Native Village of Chickaloon v. NMFS,* 947 F.Supp.2d 1031, 1049 (D.Alaska 2013).

"Optimum sustainable population" or OSP is "the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." 16 U.S.C. § 1362(9).[5]

"The primary purpose of the MMPA is to protect marine mammals; the Act was not intended as a 'balancing act' between the interests of [ ] industry and the animals. The interests of the marine mammals come first under the statutory scheme, and the interests of the industry, important as they are, must be served only after protection of the animals is assured." *Fed'n of Japan Salmon Fisheries Co-op. Ass'n v. Baldridge,* 679 F.Supp. 37, 46 (D.D.C.1987) *aff'd and remanded sub nom. Kokechik Fishermen's Ass'n v. Sec'y of Commerce,* 839 F.2d 795 (D.C.Cir.1988); *Comm. for Humane Legislation, Inc. v. Richardson,* 414 F.Supp. 297, 306 (D.D.C.) *aff'd,* 540 F.2d 1141, 1148 (D.C.Cir.1976).

## II. Marine Mammal Import Permits

In furtherance of these statutory goals and purposes, the MMPA imposes a moratorium on the taking[6] and importation of marine mammals, subject to certain limited exceptions. *See* 16 U.S.C. §§ 1371, 1374. However, the MMPA explicitly prohibits the import of any marine mammal that was—(1) pregnant at the time of taking; (2) nursing at the time of taking,[7] or less than eight months old, whichever occurs later; (3) taken from a species or population stock which the Secretary has, by regulation, designated as depleted;[8] or (4) taken in a manner deemed inhumane by the Secretary. 16 U.S.C. § 1372(b); 50 C.F.R. § 216.12(c).

Under Section 1374 of the MMPA, NMFS may issue permits for the taking or importation of marine mammals for scientific research, enhancing the survival or recovery of a species or stock, or public display, provided that certain requirements are met. *See* 16 U.S.C. §§ 1371(a)(1), 1374(c)(2)(A); 50 C.F.R. § 216.34. Section 1374(d)(3) of the MMPA requires that the permit applicant "must demonstrate ... that the taking or importation of any marine mammal under such permit will be consistent with the [Act] and the applicable regulations." 16 U.S.C. § 1374(d)(3); *see also id.* at § 1374(b)(1). "Essential to this requirement of § 1374(d)(3) that a permit applicant demonstrate a proposed import 'will be consistent with the purposes of [the MMPA],' is the mandate that stocks 'should not be permitted to diminish below their optimum

5. The regulations further define "optimum sustainable population" as "a population size which falls within a range from the population level of a given species or stock which is the largest supportable within the ecosystem to the population level that results in maximum net productivity." 50 C.F.R. § 216.3.

6. "Take" means "to harass, hunt, capture, or kill ... any marine mammal" or "to attempt to" do any of those things. 16 U.S.C. § 1362(13).

7. Although inapplicable here, the MMPA allows permits for the importation of pregnant or nursing marine mammals if necessary for the protection or welfare of the animal. 16 U.S.C. § 1372(b).

8. "Depleted" means "any case in which [NMFS] after consultation with the Marine Mammal Commission ... determines that a ... stock is below its optimum sustainable population." 16 U.S.C. § 1362(1)(A). After denying Georgia Aquarium's permit application, NMFS was petitioned to formally designate the Sakhalin–Amur stock as depleted and found that the designation may be warranted, but has not yet made a decision. 79 Fed.Reg. 44,733 (Aug. 1, 2014).

sustainable population[s] [OSP].'"[9] 16 U.S.C. § 1361(2); *Comm. for Humane Legislation, Inc. v. Richardson,* 414 F.Supp. at 310.

Pursuant to the Act, NMFS's regulations provide "issuance criteria" for such permits. 50 C.F.R. § 216.34. Under the relevant issuance criteria, "the applicant must demonstrate" that (a) "[t]he proposed activity by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock," (50 C.F.R. § 216.34(a)(4)), and (b) "[a]ny requested import or export will not likely result in the taking of marine mammals or marine mammal parts beyond those authorized by the permit," (50 C.F.R. § 216.34(a)(7)). In addition, § 216.12(c)(2) requires an applicant to show that the animals it seeks to import were not "nursing at the time of taking." *See also* 16 U.S.C. § 1372(b).

## III. Burden of Proof

As NMFS stated in its Decision Document denying Georgia Aquarium's permit application, "it is the [permit] applicant's responsibility, not that of NMFS, to demonstrate that the MMPA criteria have been met." (AR 8998 at 17421.) *See* 16 U.S.C. § 1374(d)(3); 50 C.F.R. § 216.34 (stating "the applicant must demonstrate that" the issuance criteria are met). Section 1374 of the MMPA requires that an applicant for a permit for taking marine mammals must demonstrate that the taking "will be consistent with the purposes" of the Act. 16 § U.S.C. 1374(d)(3). "The purpose of the requirement was stated clearly in the legislative history." *Comm. for Humane Legislation, Inc. v. Richardson,* 540 F.2d 1141, 1150–51 (D.C.Cir.1976) (citing H.R.Rep. No. 92–707, at 18 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4151–52.) As the House Report to the MMPA states:

> In every case, the burden is placed upon those seeking permits to show that the taking should be allowed and will not work to the disadvantage of the species or stock of animals involved. If that burden is not carried—*and it is by no means a light burden*—the permit may not be issued. The effect of this set of requirements is to insist that the management of the animal populations be carried out with the interests of the animals as the prime consideration.

H.R.Rep. No. 92–707, at 18 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4151–52 (emphasis added). Thus the MMPA "imposes a strict burden of proof on each applicant seeking to ... import marine mammals [for public display]," *Comm. for Humane Legislation, Inc. v. Richardson,* 414 F.Supp. at 303, under which it "must demonstrate ... that the ... importation ... under such permit will be consistent with": (1) "the purposes of [the MMPA]," and (2) "the applicable regulations." 16 U.S.C. § 1374(d)(3).

Georgia Aquarium asserts that "[t]he Congressional policy behind the MMPA is central to this case," but instead focuses on the support for permits for the public display of marine mammals because of the educational importance of informing the public about "the esthetic, recreational, and economic significance of marine mammals and their role in the ocean system."

9. At oral argument, Georgia Aquarium suggested that there is no longer any requirement to assess OSP in public display permits, citing to *Animal Protection Institute of America v. Mosbacher,* 799 F.Supp. 173 (D.D.C.1992). The Court in *Mosbacher* simply rejected the petitioners' argument that the Secretary of Commerce was required to ascertain the OSP of the mammal stocks prior to issuing a permit and found that based on the information available regarding the beluga stock size of approximately 23,000, the agency's decision to approve the request to import 4 whales was not arbitrary and capricious. 799 F.Supp. at 180.

(Doc. 55-1 at 13-14.) Thus, according to Georgia Aquarium, NMFS's permit denial is "inconsistent with the Congressional policy to further the public display of marine mammals" and is a "setback to marine mammal conservation, research and education." (*Id.* at 14.)

DISCUSSION

In its Motion for Summary Judgment, Georgia Aquarium asserts that NMFS's permit denial rests on the following ten identified errors:

(1) NMFS arbitrarily created a new legal standard to measure the sustainability of removals from the wild—a standard that was applied only to the Aquarium's permit application. NMFS's newly-contrived standard was not applied before the permit application and has not been applied since.

(2) NMFS made findings about the number of whales removed from the Sakhalin-Amur region without any supporting evidence. NMFS admits the paucity of their evidence by finding that the number of unproven, theoretically possible removals could have exceeded the sustainable level rather than finding that the actual level of removals was, in fact, not sustainable.

(3) NMFS improperly relied on certain data that NMFS admits are incorrect.

(4) NMFS erroneously based the permit denial in part on a finding that the Sakhalin-Amur beluga population is declining and, therefore, removals are harmful. NMFS, however, admits it has no actual evidence of a population decline, stating instead that any such decline is only theoretically possible and "undetected."

(5) NMFS incorrectly theorized the Sakhalin-Amur beluga population might be declining based on an improper comparison of (a) historic population estimates derived from multiplying the number of whales sighted on the surface during an aerial population survey by a correction factor of 12 (to account for unseen and submerged animals) with (b) current population estimates derived from multiplying the number of sighted whales by only 2. Such an apples-to-oranges analysis could never survive unbiased scientific review, particularly when application of the same correction factor to both aerial surveys shows the population is increasing.

(6) To further create the illusion of a possible declining beluga whale population, NMFS improperly compared the maximum possible historic population to the current minimum possible population, and otherwise manipulated the statistics. Comparing maximums to minimums and similar statistical manipulations violates common sense and basic scientific method.

(7) Despite finding it "extremely unlikely" that approving the import would lead to more imports of belugas into the U.S., NMFS concluded, without any evidentiary basis, that this import could create a demand in other nations to remove belugas from the Sea of Okhotsk in violation of the MMPA.

(8) NMFS incorrectly decided the MMPA applies extraterritorially and demanded that Russia and its citizens cease collecting and then exporting beluga whales to other nations, an action unsupported by applicable legal precedent.

(9) NMFS erroneously concluded 5 of the 18 belugas were nursing when collected, even though no mother-calf pairs or lactating females were collected and even though NMFS has no evidence of any nursing behavior.

(10) Through the totality of their errors and denial of the permit, NMFS's decision ignores the public policy that the prudent, properly regulated public display of marine mammals is an important aspect of public education and public support for conservation, and also allows for critically important conservation research. This

public policy is integral to the MMPA as articulated in its provisions and in 40 years of Congressional intent.

Georgia Aquarium's arguments on appeal cast a wide net, but haul in little of substance. As succinctly explained by another court faced with similar questions posed here:

> Congress foresaw the possibility that, in a given situation, there would be a lack of scientific information as to whether a proposed level of taking would be to the disadvantage of the marine mammals involved, and that might result in an inability to find whether the stock was at its optimum sustainable population. Before issuing any permit for the taking of a marine mammal, the Secretary must first have it proven to his satisfaction that any taking is consistent with the purposes and policies of the act—that is to say, that taking will not be to the disadvantage of the animals concerned. If he cannot make that finding, he cannot issue a permit. It is that simple.

*Fed'n of Japan Salmon Fisheries Co-op. Ass'n v. Baldridge,* 679 F.Supp. 37, 46 (D.D.C.1987) *aff'd and remanded sub nom. Kokechik Fishermen's Ass'n v. Sec'y of Commerce,* 839 F.2d 795 (D.C.Cir.1988) (citing *Comm. for Humane Legislation, Inc. v. Richardson,* 414 F.Supp. at 310); *see also* 118 Cong.Rec. 7686 (1972). Here, NMFS found that "the historical information required to support the Aquarium's assertion that [its] import will meet the MMPA [was] lacking." (AR 8998 at 17447.)

The Agency followed the statutory mandate of the MMPA in its denial of the Aquarium's permit application. First, NMFS's determination that the Sakhalin–Amur stock is likely declining and is subject to adverse impacts beyond the ongoing live-capture operations cited by Georgia Aquarium complies with the primary purpose of the MMPA to prevent marine mammals species and population stocks from "diminish[ing] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, [and] below their optimum sustainable population." 16 U.S.C. § 1361(2). Second, NMFS's interpretation of its regulation as requiring that Georgia Aquarium demonstrate that the permit would not result in any replacement takes of additional beluga whales by the Russian capture operation is consistent with the purpose of the MMPA to prevent the decline of this stock of whales below its optimum sustainable population. And third, NMFS's finding that some of the beluga whales proposed for import, estimated to be approximately 1.5 years old at the time of capture, were potentially still nursing and not yet independent of their mothers is based on unrebutted scientific literature that beluga whales are not likely fully independent and still rely to some extent on their mother's milk until 3 years of age.

For these reasons, set forth more fully below, the Court finds that NMFS's permit denial was consistent with the purposes and requirements of the MMPA, and therefore was not arbitrary and capricious.

## I. NMFS's finding that Georgia Aquarium failed to show that its import permit, by itself or in combination with other activities, will not likely have an adverse impact on the Sakhalin–Amur stock of beluga whales was not arbitrary and capricious

Georgia Aquarium's permit application seeks authorization from NMFS to import eighteen previously captured beluga whales from Russia's Sea of Okhotsk Sakhalin–Amur provisional management stock.[10] (AR 8927 at 14284–14285, Table 1.)

10. According to Georgia Aquarium's application, the International Whaling Commission

Table 1. Beluga Whales Requested for Import

| ID No. | Sex | Estimated Weight (kilograms) | Estimated Length (meters) | Estimated Age [1] | Date of Collection | Estimated Age at Collection |
|---|---|---|---|---|---|---|
| 5/10 | F | 500 | 2.94 | 7.5 | Aug–Sep.2010 | 5.5 |
| 7/10 | M | 350 | 2.74 | 3.5 | Aug–Sep.2010 | 1.5 |
| 5/10 | M | 530 | 2.90 | 5.5 | Aug–Sep.2010 | 3.5 |
| 11/10 | M | 520 | 3.30 | 7.5 | Aug–Sep.2010 | 5.5 |
| 12/10 | M | 560 | 3.22 | 7.5 | Aug–Sep.2010 | 5.5 |
| 1/10 | M | 250 | 2.66 | 3.5 | Aug–Sep.2010 | 1.5 |
| 2/10 | M | 310 | 2.62 | 3.5 | Aug–Sep.2010 | 1.5 |
| 3/10 | M | 360 | 2.73 | 3.5 | Aug–Sep.2010 | 1.5 |
| 6/10 | F | 460 | 3.20 | 7.5 | Aug–Sep.2010 | 5.5 |
| 9/10 | F | 180 | 2.40 | 3.5 | Aug–Sep.2010 | 1.5 |
| 10/10 | F | 650 | 3.52 | 11.5 | Aug–Sep.2010 | 9.5 |
| 27/11 | F | 280 | 2.40 | 3.5 | June 2011 | 2.5 |
| 24/11 | F | 500 | 2.92 | 5.5 | June 2011 | 4.5 |
| 21/11 | F | 300 | 2.48 | 3.5 | June 2011 | 2.5 |
| 23/11 | F | 350 | 2.70 | 3.5 | June 2011 | 2.5 |
| 17/11 | M | 350 | 2.74 | 3.5 | June 2011 | 2.5 |
| 75/06 | F | 880 | 3.80 | 11.5 | June 2006 | 5.5 |
| 78/06 | F | 940 | 3.95 | 11.5 | June 2006 | 5.5 |

[1] Estimated ages were current on January 1, 2012.

(AR 8927 at 14286.) Because the subject whales were all originally captured prior to the permit request in 2006, 2010, and 2011, Georgia Aquarium's permit application states,

> [t]he activity under this permit will not include take from the wild. The action is only for importation for public display. The animals to be imported have already been collected and the potential impacts—if any—of their removal from the wild would occur regardless of the proposed permit activity. Therefore, the permit activity would not directly result in effects on the Sakhalin–Amur beluga whale stock [and] any indirect effect of the permit activity on the Sakhalin–Amur beluga whale stock will be negligible.

(IWC) has identified three provisional beluga whale stocks in the Sea of Okhotsk—Shelikov Bay, Sakhalin Bay/Amur River, and Shantar Bay—based primarily on the geographic distinction of summer aggregations of the whales. (AR 8927 at 14284, 14313.) Georgia Aquarium asserts in its application that "overall genetic and satellite tagging study results suggest that considerable gene flow occurs between the beluga whales that form summer aggregations in the Sakhalin–Amur region and those that form summer aggregations in the Shantar regions in the Sea of Okhotsk" which "suggests that [all three] aggregations are genetically homogenous and constitute a single stock of beluga whales." (*Id.* at 14284) The application also notes that "observational data suggest that different summer breeding aggregations may represent different populations but, in most cases, it is not known if these populations are genetically distinct." (*Id.* n. 1.) The permit application also notes that delineation of stocks within the Sea of Okhostk has been the subject of scientific debate. (*Id.* at 14443.) Georgia Aquarium thus acknowledges IWC's treatment of the Sakhalin–Amur beluga whales as a distinct stock for purposes of its permit application. (*Id.* at 14284 (noting on page 2 of the permit application under "Target Species," "This application is for the importation of 18 beluga (or white) whales (Delphinapterus leucas))." These whales were originally collected in Sakhalin Bay in the Sea of Okhotsk, and are members of the Sakhalin–Amur provisional management stock identified by the International Whaling Commission (2000); *see also,* 8927 at 14332–14333, 14335–14337.)

(*Id.* at 14297.) There is some indication in the record, however, that some or all of the whales were captured specifically for Georgia Aquarium in anticipation of its applying for an import permit. The whales have been held by UMMRS, which is not a public display facility, exclusively for Georgia Aquarium pending the permit approval. Thus, NMFS viewed this permit request as one for the import of wild-caught belugas and not as one for the transfer of previously captive mammals.

Prior to and in preparation for submitting its permit application, Georgia Aquarium joined with other public display institutions/aquaria to research beluga whales in the Sakhalin—Amur region in the Sea of Okhostk to assess the sustainability of live-capture removals and the effects on that population stock. This research was submitted to an independent scientific review panel under the International Union for Conservation of Nature (IUCN) for review and to determine a "potential biological removal level" (referred to as PBR) for this stock of whales. (AR 8927 at 14296.) "Potential biological removal level" is a defined term under the MMPA, meaning:

> the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population. The potential biological removal level is the product of the following factors:
>
> (A) The minimum population estimate of the stock.
>
> (B) One-half the maximum theoretical or estimated net productivity rate of the stock at a small population size.
>
> (C) A recovery factor of between 0.1 and 1.0.

16 U.S.C. § 1362(20). The Act's OSP requirement is built into the calculation of PBR.

Georgia Aquarium's PBR calculation, based on aerial survey and population estimation data collected by Dr. Olga Shpak (of the A.N. Severtsov Institute of Ecology and Evolution, Russian Academy of Sciences) in 2009 and 2010, concluded that "the number of animals that could be removed without initiating a population decline" of the Sakhalin–Amur stock[11] was 30 whales per year on average over a 5–year period.[12] (AR 8927 at 14296 (citing Reeves et al. 2011 [IUCN Report] ).) As explained in detail in Appendix A to the

11. Based on its position that there is a single stock of beluga whales in the Sea of Okhotsk, Georgia Aquarium also calculated a PBR of 86 for the combined Sakhalin–Amur and Shantar aggregations. (AR 8927 at 14296.) NMFS declined to consider the Sakhalin–Amur/Shantar stocks as an aggregated single stock. (AR 8998 at 1744.) Although Georgia Aquarium has littered its briefs with various references to the combined Sakhalin–Amur/Shantar stock, it has not posed a direct challenge in this appeal to NMFS's determination that "the appropriate population unit for the evaluation of this action includes only those animals encompassing the Sakhalin Bay and the Amur River estuary and river." (*See id.*) And indeed it cannot challenge NMFS's determination, made in agreement with the IUCN's recommendation, having acknowledged in its permit that the question is one of scientific debate, and where a combined PBR calculation was not adopted by any of the organizations involved, including the IUCN (AR 8915 at 13780–13782), the Marine Mammal Commission (AR 8730 at 10094–10095), or NMFS (AR 8998 at 17444).

12. The original PBR calculation of 29 was subsequently increased to 30 based on additional research and data. (AR 8927 at 14296.) In addition, according to Georgia Aquarium's permit application, PBR was determined using conservative inputs for the correction factors and recovery rate such that "it is possible, and perhaps likely, that more than 30 beluga whales could be removed from the Sakhalin–Amur stock annually without initiating a population decline." (AR 8927 at 14296.)

permit application, Georgia Aquarium's PBR calculation is based on: (1) a minimum population estimate of the Sakhalin–Amur stock of 2,972, (2) an estimated net productivity rate of 0.04, and (3) a recovery factor of 0.5 (applied to a stock of unknown recovery status such as the Sea of Okhotsk beluga whales whose "populations have been depleted, and their recovery trajectory is unknown"). (AR 8927 at 14335–14336.) Table 2 to the application shows Georgia Aquarium's PBR calculation:

Table 2. Sakhalin-Amur Population Estimate and PBR Calculation

| Survey Date | Region | Estimated Number of Belugas | Relative Statistical Error (ECV) |
|---|---|---|---|
| September 13, 2009 | Total Sakhalin-Amur | 2293 | 0.355 |
| August 3, 2010 | Total Sakhalin-Amur | 1574 | 0.265 |
| | Mean weighted value | 1774 | 0.213 |
| | Corrected beluga number= | 3547 | |
| | | | |
| | Nmin | 2972 | |
| | PBR (Rmax=0.04, Fr=0.5) | 30 | |

(*Id.* at 14336.)

Georgia Aquarium compared this PBR to the number of removals solely from the existing live-capture operation in the Sakhalin Bay each year from 2000 to 2011,

shown below in Table 3[13] to the permit application:

Table 3. Number of Beluga Whales from Sakhalin-Amur Stock Live-Captured by Year

| Year | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Mean |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Whales Collected | 13 | 22 | 10 | 26 | 28 | 31 | 20 | 0 | 25 | 24 | 30 | 33 | 21.3 |

Source of years 2000–2010: Shpak et al. 2011
Source of year 2011: Mukhametov pers. comm. 2012

(*Id.* at 14297.) The application then notes that:

- With the exception of 2010 and 2011,[14] less than 30 total belugas were collected from Sakhalin Bay during any individual year from 2000 to 2011 (Table 3) and in no years recorded, did the number of belugas collected exceed 33. The average number of belugas collected over the last 5 years is 22.4.
- A number of whales were collected in 2006, 2010, and 2011 that would not be imported into the U.S. under this permit. The total combined number of belugas collected (Table 3) includes those that would be imported under this permit as well as others that would not be imported under this permit. The total number of belugas collected combining those that would be imported under this permit in addition to all other belugas collected in 2006, 2010, and 2011 was 83. This is an average collection of 27.7 belugas.

(AR 8927 at 14296–14297.) Based on this data, Georgia Aquarium concluded that "[b]ecause this is below the lowest possible PBR of 30, the effects of combined takes of beluga whales from this area, including those that would be imported under the permit activity, are not [ ] anticipated to result in adverse impacts on the Sakhalin–Amur stock."[15] (*Id.* at 14297.) Georgia Aquarium also determined that "there is no indication of any additional human-caused incidental mortality (IUCN 2011), so incidental mortality has not been taken into account in the above calculations." (AR 8927 at 14337.)

NMFS determined that Georgia Aquarium failed to show that the requested import, by itself or in combination with other

13. This table summarizes live-capture removals of whales only. These numbers do not reflect a combination of live-capture removals with removals due to hunting, subsistence takes, or other sources of mortality as discussed herein.

14. This appears to be an error. According to "Table 3" a total of 31 whales were also captured in 2005. Therefore, the Court presumes that Georgia Aquarium meant to indicate that with the exception of 2005, 2010, and 2011, less than 30 total belugas were collected from Sakhalin Bay during any individual year from 2000 to 2011.

15. Georgia Aquarium also noted its calculated PBR of 30 was below an "an annual quota of live-captures of beluga whales in Sakhalin Bay," as authorized by the Russian Government, which according to its application "has ranged between 40 and 57." (AR 8927 at 14294, 14323, 14337 (citing (Shpak et al. 2011)).)

activities will not likely have a significant adverse impact on the stock, as required by 50 C.F.R. § 216.34(a)(4):

> **CRITERION 4:** The proposed activity by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock (216.34(a)(4)).
>
> **NMFS determination:** The Aquarium has not demonstrated that their activity will meet this requirement. The information they provided, including then analysis of impacts in Section IV.F.. does not adequately consider the impacts of the proposed importation in combination with other past, present, and foreseeable future actions affecting the stock, including the ongoing live-captures from this stock. As discussed in Attachment 1. the Aquarium calculated a Potential Biological Removal (PBR) [5] level for the Sakhalin–Amur stock and compared this to the current rate of removal for the live-capture trade. They used this calculated PBR as their justification that the proposed importation meets me MMPA criterion that the proposed activity, by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock.
>
> Generally, looking only at the PBR and comparing that to the number of animals removed by a single activity is not an appropriate way to assess whether the proposed activity by itself or in combination with other activities, would likely have a significant adverse impact on the species or stock In addition, if the Sakhalin–Amur stock has declined, as the available data seem to suggest. PBR is not an appropriate proxy to determine the sustainability of the live-capture activity.
>
> Based on the data available, we cannot discount the possibility that the Sakhalin–Amur stock has experienced a small, yet significant and unsustainable decline over the past several decades that has gone undetected given the minimal amount of monitoring that has occurred over the years. The live capture of beluga whales cannot be discounted as a possible contributing factor to this decline. See Attachment 1 for more detail.

(AR 8998 at 17422–23.) NMFS characterized the relevant issue under the MMPA as whether "the beluga whale trade in the Sea of Okhotsk [is] sustainable[.]" (*Id.* at 17443.)

As explained further in Attachment 1 to the decision, "[t]he information available for [NMFS] to determine whether the Aquarium meets this criterion is considered data-poor and has considerable uncertainty. There is very little documented information about past abundance levels that can be compared to the present and there is limited information on past and current threats to this population." (*Id.* at 17443.) NMFS noted its concerns with the Aquarium's PBR-based analysis—offered to demonstrate that the Russian capture operation was sustainable at current levels—as follows:

> First, the information available leads us to believe that removals likely exceed PBR. Second, even assuming that, as the Aquarium posits, removals are commensurate with PBR, that measure is only appropriate where the stock is increasing, and that does not appear to be the case for the stock in question. In addition, we examined the application under a framework established by an intergovernmental organization and concluded that the information necessary to determine population trends that would be necessary to rely solely on PBR under their model is not available.

(*Id.*)

Georgia Aquarium challenges as arbitrary and capricious, NMFS's determina-

tions that: (1) the PBR analysis cannot be used to assess the sustainability of removals from a declining marine mammal population; (2) the population of Sakhalin–Amur belugas is declining; and (3) the total number of removals exceeded PBR. (Doc. 55–1 at 16.)

### A. NMFS's determination that PBR is not an appropriate method to assess adverse impacts to a declining species stock was not arbitrary and capricious

Georgia Aquarium asserts that the MMPA employs PBR to measure sustainability and that removals below PBR are sustainable and thus satisfy the criteria in 50 C.F.R. § 216.34(a)(4). Georgia Aquarium further contends its permit application meets this standard because the total number of whales collected and proposed for import (18) was below the calculated PBR (30). Thus, Georgia Aquarium challenges NMFS's rejection of PBR as an appropriate measure of the sustainability of the live-capture of beluga whales in the Sea of Okhostk.

Specifically, Georgia Aquarium asserts that NMFS's "theory that PBR cannot be used to assess the sustainability of takes is a newly-contrived standard" applied only to the Aquarium's permit application. According to Georgia Aquarium, prior to and after denying the Aquarium's permit application, NMFS's position has uniformly been that PBR is appropriate to assess the sustainability of removals from declining populations. As support for its position, Georgia Aquarium points to a purported "practice and policy" of NMFS using PBR for declining populations in issuing permits and other regulatory actions, including:

(1) a 2003 scientific research permit authorizing the lethal taking of 20 Steller sea lions from an endangered and declining population, (Doc. 55–1 at 1819, Exhibit 1 to Mot.);

(2) a 2005 rule setting the annual Pribilof Islands fur seal subsistence take ranges as required by regulations at 50 C.F.R. § 216.72(b) to establish the number of seals that may be taken by Alaskan Native (Aleut) residents annually on the Pribilof Islands, (Doc. 55–1 at 19);

(3) a 2007 scientific research permit allowing the lethal taking of northern fur seals from a declining population of the eastern Pacific stock, (Doc. 55–1 at 20);

(4) a 2012 rule to implement a False Killer Whale Take Reduction Plan to reduce incidental mortalities and injuries of the Hawaii Pelagic and Hawaii Insular stocks of false killer whales in the Hawaii-based commercial longline fishers, (Doc. 55–1 at 21);

(5) a 2014 scientific research permit authorizing the lethal taking by NMFS scientists of 22 northern fur seals from the declining eastern Pacific stock, (Doc. 55–1 at 21, Exhibit 2 to Mot.);

(6) the 2014 Final Supplemental Environmental Impact Statement Setting the Annual Subsistence Harvest of Northern Fur Seals on the Pribilof Islands for the purpose of conserving northern fur seals and manage the subsistence harvest of fur seals on St. George Island for their long-term sustainable use for purposes of cultural continuity, food, clothing, arts, and crafts, (Doc. 55–1 at 22); and

(7) litigation arising out of a challenge to a 2005 permit authorizing the lethal taking of 20 animals from the declining Steller sea lion in *Humane Society of the U.S. v. Department of Commerce,* 432 F.Supp.2d 4 (D.D.C.2006), in which NMFS stated in its summary judgment briefing that stated the "plain language" of the MMPA provides that "PBR analysis may be used to analyze" the impact of removing these marine mammals from the wild. (Doc. 55–1 at 23, Exhibits 5 and 6 to Mot.)

Georgia Aquarium asserts that the selective application of this new standard only to its permit application demonstrates the arbitrary and capricious nature of NMFS's decision. (Doc. 55–1 at 18 citing *Sierra Club v. Johnson,* 436 F.3d 1269, 1282 (11th Cir.2006) ("[W]hen an agency has interpreted one of its regulations in a consistent manner, that interpretation is 'controlling unless plainly erroneous or inconsistent with the regulation.' "); *Manhattan Ctr. Studios, Inc. v. NLRB,* 452 F.3d 813, 816 (D.C.Cir.2006) (when an agency departs from precedent without reason, its decision will be vacated); *Mendez–Barrera v. Holder,* 602 F.3d 21, 26 (1st Cir.2010) (agencies must apply the same basic rules to all similarly situated applicants); *Henry v. INS,* 74 F.3d 1, 6 (1st Cir.1996) (an administrative agency must respect its own precedent, and cannot change it without explanation); *Fred Beverages, Inc. v. Fred's Capital Mgmt. Co.,* 605 F.3d 963, 967 (Fed.Cir.2010) ("Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious.").) *But see* footnote 19 *infra,* discussing contrary authority regarding Georgia Aquarium's "inconsistency" argument.

In response, NMFS asserts that neither the MMPA, the regulations, nor the Agency's practice or policy mandate reliance on PBR in this case. According to the Agency, PBR was added to the MMPA as a U.S. commercial fisheries management tool in 1994, not as a test governing the import of marine mammals for public display. (Doc. 59–1 at 34–35 (citing S.Rep. No. 103–220 at 1, reprinted in 1994 U.S.C.C.A.N. 518 (1994)).) Georgia Aquarium acknowledges that PBR is not a required MMPA standard for determining an allowable take level in this context, but asserts that PBR is consistently used as a metric because it is the most applicable measure of take levels.

PBR is a formula incorporated into Sections 1386 and 1387 of the MMPA governing domestic stock assessment reports and marine mammal take reduction plans for U.S. fisheries.[16] 16 U.S.C. §§ 1386(a)(6), 1387(f)(2)-(3), (5), (7), (8). It is not included or referenced in § 1374 of the MMPA governing permits. Neither the statutory nor regulatory provisions of the MMPA require the Agency to calculate PBR for a given marine mammal stock that is the subject of an import permit.

As Georgia Aquarium points out, however, NMFS has considered PBR outside of the U.S. commercial fisheries context. But, according to NMFS Georgia Aquarium "significantly overstates NMFS's limited use of PBR" in other cases and its suggestion that the Agency has consistently used PBR in a large number of cases is misleading. The majority of examples cited by Georgia Aquarium as evidence that it was entitled to rely on PBR involve the same two species and same type of activity merely for different years: (1) scientific research for Steller sea lions listed under the Endangered Species Act ("ESA"); (2) scientific research for depleted northern fur seals; and (3) native subsistence take of northern fur seals that is exempted from the MMPA 16 U.S.C. § 1371(b).[17]

16. NMFS does not prepare stock assessments for the Russian stocks of beluga whales pursuant to 16 U.S.C. § 1386. Because NMFS does not regulate commercial fishing operations in Russia, NMFS does not prepare incidental take reduction plans for the subject whales. 16 U.S.C. § 1387.

17. NMFS implies that because the MMPA treats scientific research permits and public display permits differently, use of PBR to justify lethal takes of threatened or endangered species is appropriate. The parties are essentially inviting this Court to evaluate the reasonableness of NMFS's reliance on PBR for declining marine mammal stocks in other contexts which is beyond the scope of this

(Doc. 59–1 at 35.) The Court agrees that NMFS's discretionary consideration of PBR in a handful of situations involving scientific research and subsistence take do not establish a "practice and policy" of relying on PBR in all circumstances. Notably, as this is the first application to import wild caught marine mammals for public display since the 1994 addition of PBR to the MMPA and the 1996 adoption of the regulatory issuance criteria—NMFS cannot be said to have an established practice of relying on PBR in this specific context.[18]

The Court is not convinced by Georgia Aquarium's claim that NMFS has relied on PBR as a talismanic test of sustainability in every one of its decisions under the MMPA. As NMFS has demonstrated from the specific administrative decisions relied on by Georgia Aquarium, NMFS has placed variable weight on the value of PBR, including: (1) in its 2007 final environmental impact statement for scientific research on Steller sea lions and northern fur seals, NMFS identified PBR as only "an upper threshold level of mortality" and stated that it was not "obligated to authorize takes up to these threshold levels.... These upper limits will be used only as guidelines for the permitting process," (Doc. 59–1 at 37, citing http://www.nmfs.noaa.gov/pr/pdfs/permits/eis/fpeis.pdf), and (2) for subsistence take of northern fur seals, NMFS found that allowing harvest up to the level of PBR would have an adverse impact: "[a]lthough by definition and modeling, removal at or below the PBR level is expected to allow the population to recover, the unknowns combined with the decreasing population result in a conditionally significant adverse effect to the population." (*id.*, citing http://alaskafisheries.noaa.gov/protectedresources/seals/fur/eis/final0505.pdf). Indeed, as the Marine Mammal Stock Assessment Guidelines which discuss the use of PBR explain, "PBR is an upper limit to removals that does not imply that entire amount should be taken" and when the Agency prepares stock assessments, "[e]stimates of PBR [and] human-caused mortality ... are required" considerations. (AR 8934 at 16325.) NMFS has shown that where the Agency has considered PBR outside of the U.S. commercial fisheries context, it has treated PBR as only one "quantitative tool" and that it is not used as the sole basis for its impact analyses. And, even in the commercial fisheries context, PBR was not designed as an "absolute threshold" but is used as a guideline to identify where further incidental take reduction measures are warranted.

Finally, NMFS responds that it did not apply a "new" standard to the Aquarium by *considering* but *declining to rely* on Georgia Aquarium's PBR calculation in this case. Instead, NMFS applied the re-

administrative appeal. The question here is whether NMFS's rejection of Georgia Aquarium's PBR as an appropriate gauge of beluga live-capture sustainability was arbitrary and capricious. It is not necessary for the Court to consider the differences between scientific research and public display import permits under the MMPA in its consideration of whether Georgia Aquarium's requested permit satisfied the relevant permit issuance criteria here—that the permitted activity is not likely to have a significant adverse impact on the wild population.

18. All other import permits for public display considered by NMFS over the past two decades have involved importation of marine mammals that were captive born or had already been in public display in the foreign country for some time. The Aquarium's application is the first of its the kind to be reviewed under the current statutory and regulatory issuance criteria. (Doc. 59–1 at 36.)

quired MMPA standard: that "[t]he proposed activity by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock." 50 C.F.R. § 216.34(a)(4). The Court does not adopt Georgia Aquarium's view that the Agency has failed to treat like cases alike and arbitrarily diverged from its past policies and decisions.[19] Instead, and as discussed in more detail below, the Court finds that the administrative record demonstrates that the Agency appropriately exercised its discretion in declining to adopt PBR to the exclusion of all other evidence of an adverse impact on a marine mammal stock in light of the notable lack of reliable information regarding the Sakhalin–Amur beluga whale population data.

**B. NMFS's determination that Georgia Aquarium's PBR could be exceeded due to sources of removal other than live-capture was not arbitrary and capricious**

Georgia Aquarium asserts on appeal that its PBR calculation is the appropriate standard here because it is based on research by scientists with the A.N. Severtsov Institute of Ecology and Evolution of the Russian Academy of Science ("Severtsov Institute") completed in consultation with and peer reviewed by a panel of beluga experts chosen by the International Union for the Conservation of Nature and Natural Resources ("IUCN"). "Despite the unanimous conclusion of these experts, [NMFS] concluded that PBR could be exceeded due to removals from sources other than public display and, therefore, denied the Aquarium's permit." (Doc. 55–1 at 32.) Georgia Aquarium maintains that there is no evidence to support NMFS's claim of additional sources of removal. This argument is fishy.

The principal reason for NMFS's denial of Georgia Aquarium's import permit application was that:

> The Aquarium's reliance on a comparison between PBR and the number of live removals is misplaced. Looking solely at PBR, or the average number of animals taken during years in which animals proposed for importation were captured, is not an appropriate way to assess whether the proposed activity by itself, or in combination with other activities, would likely have a significant adverse impact on the species or stock. The Aquarium claims that the captures are sustainable: however, this is dependent on the assumption that the number of animals being removed from the population during live-captures will remain under the calculated PBR and that that no other human-caused factors are contributing to loss of animals from the population.
>
> However, in three separate years 30 or more animals were taken (including 2010 and 2011, years in which animals proposed for importation were captured). In these years, the entire calculated

19. Even if the Court were to agree that NMFS reverted from its policy or practice of relying exclusively on PBR, such a change is not necessarily arbitrary and capricious. "While an unexplained change may be a basis to find an arbitrary and capricious determination, this 'is reserved for rare instances, such as when an agency provides no explanation at all for a change in policy, or when its explanation is so unclear or contradictory that we are left in doubt as to the reason for the change in direction.' Agency inconsistency is 'at most' a reason for concluding that an action is arbitrary and capricious only when the change in position is inadequately explained." *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior,* 46 F.Supp.3d 1254, 1275 (M.D.Fla.2014) (citing cases). As explained below in section B, NMFS provided a thoroughly reasoned explanation for its conclusion that Georgia Aquarium's reliance on PBR, without a consideration of other sources of human-caused mortality, did not satisfy the MMPA's permit issuance criteria.

> PBR allowance was taken in live captures, allowing for no buffer to account for other sources of human-caused mortality, which is of particular concern to us. In addition, as noted below, these numbers appear to be trending upward over time. Moreover, the number of annuals that Russia authorizes to be removed in live capture operations is not limited to the calculated PBR, Shpak et al. (2011) reported the annual quota authorized by the Russian government to be between 40–57 individuals. Finally, available data raise substantial questions about the assumption that there are no other human caused mortalities.

(AR 8998 at 17445.) NMFS's conclusion was in direct response to a concern raised by the Marine Mammal Commission in its review of Georgia Aquarium's proposed PBR calculation. The Marine Mammal Commission was concerned that:

> the PBR approach is intended to account for all human-related removals from a population. In this case, the information needed to evaluate other sources of human-related mortality is largely anecdotal or consistent with an "absence-of-evidence" argument, which does not provide a basis for a compelling argument. Thus, although using a PBR analysis might provide a useful means for evaluating the potential effects of these removals on the Sakhalin–Amur population, the uncertainties associated with this approach again emphasize the need for caution.

(AR 8730 at 10095.) In its discussion of PBR, the IUCN panel recognized the "[p]otential biases of concern when applying any guideline for sustainability of takes are under-estimation of human-caused mortality, over-estimation of Rmax [the maximum rate of population increase], and estimating the wrong numbers for the population size. . . ." (AR 8915 at 13788.)

Relying on documents submitted by the Georgia Aquarium in conjunction with its permit request, NMFS cited at least six potential sources of removal of Sakhalin–Amur beluga whales that, when added to live captures (for public display), could cause PBR to be exceeded. Georgia Aquarium's own permit application materials demonstrate that NMFS's conclusion is not arbitrary and capricious. The guidelines on PBR require that other sources of human-caused mortality should be considered. NMFS's decision to deny Georgia Aquarium's permit application because its PBR calculation failed to take into account these other potential mortality sources is therefore consistent with the MMPA.

Highlighted by NMFS in its decision document, the IUCN panel itself identified several human-related activities that may result in serious injury or mortality to Sea of Okhotsk beluga whales, including subsistence hunting, death during live-capture operations, entanglement in fishing gear, vessel strikes, climate change, and pollution. But as NMFS explained "[a]s noted in the application and the IUCN review, monitoring of other types of take in [the Sakhalin–Amur] region is low, if existent at all, and information concerning possible threats and mortality in this population of beluga whales are highlighted by a lack of substantiated data, and are largely anecdotal." (AR 8998 at 17445.)

On subsistence hunting, NMFS noted:

> • Subsistence: Little information is available on subsistence or other forms of harvest however. Shpak reported (cited in application) that annual take levels from subsistence, bycatch or illegal harvest were probably 1 to 3 per village, but NMFS has no information on how many villages would be included m this estimate. The application indicated that Shpak later stated that there was no quantifiable basis for that esti-

> mate: however, it can be assumed that some level of subsistence hunting within the region is occurring.

(AR 8998 at 17445–17446.) Shpak's 2013 report recounts the history of beluga whale hunting and harvesting practices in the Sakhalin–Amur area and provides information on recent and current harvest quotas authorized by the Russian government. Shpak notes that in Priamurye[20] (Sakhalinsky to Udskaya Bay) around 20–30 whales can be taken annually by locals. (AR 9221 at 21548 (citing Bogoslovskaya and Krupnik (2000)).)

Georgia Aquarium suggests that NMFS's reliance on Shpak's study regarding possible annual subsistence harvests of the whales by nearby villagers was misplaced. According to Georgia Aquarium, these villages are in the remote Shantar region of the Sea of Okhotsk, not in the Sakhalin–Amur region.[21] With respect to Shpak's study, Georgia Aquarium's own application states that "[s]ome subsistence, bycatch, or illegal harvest of belugas may exist today, but if so, at very low and unknown numbers. Shpak (2011) reported that annual take levels were probably 1–3 per village, but did not specify how many villages were involved or where they were located." (AR 8927 at 14322.) While Shpak does note in her 2013 report that "local people of the Shantar region may kill 1–3 belugas per village," Georgia Aquarium has ignored Shpak's separate reference to the more intensive beluga hunting practices in the Sakhalin–Amur region. Thus, NMFS's reasoned assumption that "some level of subsistence hunting within the region is occurring" is supported by documents in the Administrative Record supplied by Georgia Aquarium. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers,* 781 F.3d 1271, 1288 (11th Cir.2015) (noting that an agency does not act arbitrarily and capriciously where the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.)"

Another identified source of human-caused mortality noted by the IUCN panel is the accidental death of animals during live capture operations. NMFS determined from the information provided by Georgia Aquarium that:

> • Live Capture: As discussed above, live captures of beluga whales for public display facilities was initiated in 1986 and is on-going. In addition to the live removals, there is the potential for mortality associated with the capture events and those mortalities may not be adequately reflected in the capture records. Data on possible accidental drowning associated with live captures are not available prior to 2007 (data gap of 20+ years). Between 2007 and 2010 (the only years for which we have data), there has been one reported death of a newborn calf entangled with its mother during live capture.

(AR 8998 at 17446.) Georgia Aquarium disputes NMFS's determination that death associated with capture for public display is a relevant source of additional human-caused mortality because NMFS "cite[s] only one such death over the four years for

20. Earlier in the report, Shpak explains that Priamurye encompasses the area from the Amur to the Uda River. (AR 9221 at 21547.)

21. Georgia Aquarium relies on an earlier 2011 report by Shpak. However, Georgia Aquarium included only selected portions of the document to NMFS for its consideration with the permit application. Thus, the entire report is not in the Administrative Record before the Agency. And contrary to Georgia Aquarium's assertion that NMFS excluded the relevant portions from the record, counsel for Georgia Aquarium admitted and stipulated at the oral argument before this Court that an incomplete copy only of the 2011 Shpak report was provided to the Agency.

which any data are available." The record demonstrates that live-capture operations began in 1986, and in the only four years of data available, at least one reported death had occurred. (AR 8998 at 17446.) Thus, based on the entire record before the Agency, the Court finds that NMFS's determination that accidental deaths during these ongoing live-capture operations is a legitimate concern and its consideration of such deaths was not arbitrary and capricious.

The third source of concern for NMFS—entanglement in fishing gear—was noted by Georgia Aquarium in its application as one of the "primary human mortality risks to these beluga whales." (AR 8927 at 14322.) However on appeal, Georgia Aquarium discounts NMFS's conclusion that entanglement is a source of human-caused mortality because in 100 years "only a few cases have been reported." The IUCN report on which both Georgia Aquarium and NMFS rely, emphasizes a lack of information regarding entanglement for this stock and states:

> There is little information on unintentional human-caused mortality (such as bycatch in fishing gear). It is interesting that the directed commercial haul-seine fishery for belugas originated as a result of the incidental capture of belugas (accounts vary on the number, from 16 to 48) in a haul seine for chum salmon at Lyugi on the west coast of Sakhalin Island in 1915 (Shpak et al. 2011, their Appendix 4) Since then, few cases of entanglement have been reported. Shpak told the Panel of specific instances when single belugas were taken incidentally in coastal salmon traps, beach-set salmon gillnets, and illegal sturgeon nets. Belugas occasionally depredate coastal salmon traps and manage to enter and exit such traps without becoming entangled. On one occasion mentioned by Shpak, a beluga stayed alive inside the trap (pocket) of an 800 m long salmon net during low tide and was then pushed into deeper water and released. On another occasion, a whale was drowned in an illegal salmon gillnet. Also, a biopsy was obtained from a beluga beach-cast south of the Amur River estuary, reportedly after dying in fishing gear. Shpak told the Panel that, according to local fishermen, belugas get tangled and drown in illegal nets set for sturgeon, but rarely.

(AR 8915 at 13785.)[22] In addition, Shpak, whom IUCN cited, noted in her 2013 report:

> **Incidental mortality**
>
> Human-caused beluga incidental mortality—bycatch in salmon traps or gillnets and poachers' sturgeon nets as well as ship-strikes—is nearly impossible to be estimated in the study regions due to rejection to report by the persons implicated in such cases, the vast scarcely populated area and impossibility to arrange regular coastal patrols (Shpak et al., 2011). We are aware of few cases of bycatch in nets, and 3 times in 2007–2012 we or our colleagues have witnessed beluga bycatch in a salmon net (1–in Nikolaya bay, 2—in Ulbansky bay). The first animal was successfully released without any trauma, another was found dead, and the last one could have been released with a minor wound on the tail, but was killed instead.

(AR 9221 at 21551.)

Based on this information, NMFS noted:

22. The IUCN contrasted this information with the noted experiences (seized upon by Georgia Aquarium here) in other areas such as the St. Lawrence beluga populations in Canada, Bristol Bay, Alaska, and Cook Inlet, Alaska, where reported instances of bycatch were rare or nonexistent based on the belief that these other beluga populations are exceptional among cetaceans in their ability to avoid entanglement. (AR 8915 at 13786.)

• Beluga whale entanglement: Incidental captures of belugas as bycatch were first reported in 1915 (somewhere between 16-48 animals). Since then, few cases have been reported: however, a few specific instances of beluga entanglements in coastal salmon traps, beach-set salmon gillnets, and illegal sturgeon nets have been recalled (as told to Shpak by local fishermen). It has further been noted that belugas seem to be unusual among cetaceans in their ability to avoid entanglement. This is based on entanglement reports from other beluga populations (Bristol Bay and Cook Inlet. Alaska, as well as the St. Lawrence River. Canada) regarding few reports or observed cases of entanglements and a lack of scarring on animals which would be suggestive of previous entanglements.

(AR 8998 at 17445.) The Court finds no error in NMFS's consideration of the evidence in the Administrative Record provided by Georgia Aquarium that there have been some unquantifiable "[i]nstances of beluga whale entanglements in coastal salmon traps, beach-set salmon gillnets, and illegal sturgeon nets [as] reported by local fishermen." (*Id.*) While there only may have been few cases reported, the evidence is that there were in fact recently reported cases of such deaths. Based on these documented instances of additional human-caused mortality—NMFS's refusal to discount these other sources of mortality in its sustainability analysis was not arbitrary and capricious.

NMFS acknowledges that based on the lack of information of serious injury it is unlikely that vessel strikes are a significant source of mortality for beluga whales in the Sakhalin–Amur region.[23] As for the last two identified sources of human-caused mortality, NMFS's decision document notes:

• Climate Change: Evidence indicates that the Arctic climate is changing and one result of the change is a reduction in the extent of sea ice in at least some regions of the Arctic (ACIA 2004. Johannessen et al. 2004). Ice-associated animals, such as the beluga whale, may be sensitive to changes in Arctic weather, sea-surface temperatures, or ice extent, and the associated effect on prey availability. Currently, there are insufficient data to make reliable predictions of the effects of Arctic climate change on beluga whales, but Laidre et al. (2008) and Heide–Jorgensen et al. (2010) concluded that on a worldwide basis belugas were likely to be less sensitive to climate change than other arctic cetaceans because of their wide distribution and flexible behavior. Increased human activity in the Arctic, including increasing oil and gas exploration and development, and increased nearshore development, have the potential to impact habitat for beluga whales (Moore et al. 2000. Lowry et al. 2006), but predicting the type and magnitude of the impacts if any, is difficult at this time.

• Pollution: The Amur River is the tenth longest in the world traveling through the Heilongjiang Province of China—an area of diverse industry—and draining into the Sakhalin Bay (area of beluga captures). Non-point sources of pollution include organic and inorganic pollutants from urban area surface flow, agricultural runoff, and forest fires (Rapoport and Kondrat eva. 2008). The

**23.** NMFS's determination appears to be based on Shpak's statement that, "[a]t present, beluga-ship/motorboat collisions are unlikely to be an issue of concern in the study areas. Thus, although we do not have enough information to assess incidental human-caused mortality, we suppose, its influence on beluga population in the [Sea of Okhostk] is negligible." (AR 9221 at 21551.)

effects of pollution on beluga whales are difficult to determine and there is no basis for integrating pollution into an assessment of biological removal. There is a potential for belugas to be affected by the development that is occurring in the Sea of Okhotsk region. The IUCN Panel recommended further monitoring of this population to include analysis of blubber for contaminant loading and blood testing for reactions to toxins.

(AR 8998 at 17446–17447.)

The core of NMFS's conclusion is that "[a]lthough the full extent of other sources of mortality cannot be determined, it cannot be fully discounted or assumed to be zero" as Georgia Aquarium's permit application suggests. Despite the "limitations on data about these sources of human-caused mortality other than live-capture removals," NMFS rationally concluded that it "cannot discount the likelihood that some unquantifiable level of additional human-caused mortality is occurring." (AR 8998 at 17447.)

Georgia Aquarium asserts that because NMFS offered no evidence or proof of these additional sources, NMFS's conclusion is nothing more than speculation about a theoretically possible, but undetected, population decline. Georgia Aquarium asserts that this is undermined by NMFS's own statement that:

> The removals for live-capture of the beluga whales from the Sea of Okhotsk at the levels reported from 2000–2011 should not impede the stock's growth or recovery. If the removal of beluga whales for public display were the only source of mortality or removal from this stock, then it should be increasing at a slow rate.

(AR 8998 at 17449.) However, Georgia Aquarium's selective citation takes NMFS's comment out of context. As NMFS goes on to state, its analysis of the population trend for the Sakhalin–Amur stock is evidence that human actions other than live captures are adversely impacting the stock:

> However, based on an integration of all the available data, we believe that total removals from the Sakhalin–Amur stock have exceeded PBR, and likely the total net production, on a regular basis resulting in a small, but steady and significant decline over the past two decades. As indicated above, there are several potential sources of human-caused mortality that may have produced this decline, and the live captures of beluga whales cannot be discounted as a possible contributing factor. Regardless of the source of the decline, the result is a net loss of whales per year throughout the 20 year period which has gone undetected because of the lack of monitoring in this region during this period. Since the available information does not support a conclusion that the stock is stable or increasing, the record does not support a finding that the proposed activity is sustainable on the basis of the Aquarium's PBR-based analysis.

(*Id.*)

NMFS asserts in its brief, that "[a]t most there is a lack of evidence of the exact source and amount of other mortality. Given the lack of reliable monitoring in the region, NMFS reasonably declined to rely on the Aquarium's 'absence-of-evidence' argument regarding other mortality. The Aquarium bore the burden of proving that the imports in combination with other activities, will not likely have a significant adverse impact on the stock." (Doc. 59–1 at 29 (citing 50 C.F.R. § 216.34(a)(4).)) According to NMFS, Georgia Aquarium's PBR left too much room for error where

> the reported annual average live captures from the Sakhalin–Amur stock (about 22 whales per year) were rela-

tively close to PBR (29–30 whales per year), the rate of captures were increasing, and captures actually exceeded that PBR in three years including in 2010 and 2011, when some of the whales at issue were captured. Decision at 17443–44. It would take only a very small amount of untracked illegal subsistence hunting, unreported mortality from live captures and fishing, or mortality from other potential sources like pollution and vessel strikes, for total human-caused mortality to exceed that PBR every year.

(*Id.*) NMFS acknowledges that the evidence regarding other mortality is "anecdotal" and that evidence in isolation might have supported the opposite conclusion. But here the Aquarium's own application showed that the Sakhalin–Amur stock had shrunk in size relative to the Shantar stock, and the Agency's detailed analysis indicated that human impacts were to blame.[24] While these other sources are not as prevalent or intensive as the live-capture operation, they are not non-existent as Georgia Aquarium's PBR analysis assumes. Everyone but Georgia Aquarium—including the IUCN, the MMC, and NMFS—agrees that potential mortality of animals taken by humans, including those killed or injured in fishing gear, or accidentally drowned during live-capture operations, should be considered in addition to live-capture removals when evaluating the sustainability of any level of intentional removals. (AR 8915 at 13786; AR 8730 at 10095; AR 8998 at 17445.) Thus, the Court agrees with NMFS that given the purposes of the MMPA, the Agency reasonably adopted a precautionary approach by declining to assume that no other sources of mortality exist. *See, e.g., Fed'n of Japan Salmon Fisheries Co-op. Ass'n v. Baldridge,* 679 F.Supp. at 46.

**C. NMFS's reliance on the International Council for the Exploration of the Seas "ICES" criteria was not arbitrary and capricious**

 NMFS maintains it could have stood on its analysis of Georgia Aquarium's PBR calculation, discussed herein, as its only basis for denying Georgia Aquarium's permit under 50 C.F.R. § 216.34(a)(4). At the direction of the Agency's Chief Science Adviser, Dr. Richard Merrick, however, NMFS also considered Georgia Aquarium's PBR-based analysis under a population management framework established by the International Council for the Exploration of the Seas or "ICES." (AR 8998 at 17324; AR 9018.) NMFS explained that although "the ICES

24. In fact, NMFS recognized other impact concerns such as site fidelity and localized depletion. The IUCN panel discusses the relevance of these additional impacts:

"The available guidelines for assessing the sustainability of removals, with their simple numerical approach, ignore some aspects of the biology of social animals. For example, the selective removal of socially important individuals or classes can devastate social structure: a known example is the matriarch in a group of elephants (e.g. Foley et al., 2008). We know little, as yet, about how beluga society functions, although matrilineal transfer of knowledge on migration routes, feeding sites, and summering areas is thought to be important." (AR 8915 at 13788.) "A second concern is the fidelity of belugas to summering sites, which elsewhere is known to be high at the level of the bay or estuary. It is not known whether site fidelity also operates at finer spatial scales. If it operates on a very local scale, capture operations long continued at one or two favoured sites where captures are easy and safe might deplete a local, but thus far unrecognised, community. Available guidelines for assessing the sustainability of removals from marine mammal populations (including PBR) assume that all sex and age classes are equally vulnerable ... The sex ratio of catches is more significant. There has been a slight preponderance of females in the catches over the last few years, and if this preponderance were to increase, it would require a reassessment of the sustainability of removals." (*Id.* at 13789.)

tool is not controlling" for NMFS's consideration of the permit application, it could be considered as "an additional tool to examine the sustainability of the proposed activity." (AR 8998 at 17324.) In a multifaceted analysis, NMFS found that an application of the ICES framework "further caution[ed] against a conclusion that the proposed activity will not have a significant adverse impact on the stock." (*Id.*) In one sense, the Court questions whether it is even necessary to consider Georgia Aquarium's argument that NMFS's analysis under the ICES framework was arbitrary and capricious. The Court is strained to see how the Agency, having already determined that Georgia Aquarium's application failed to satisfy the regulatory issuance criteria, could logically be considered to have acted in an arbitrary and capricious manner in alternatively examining the permit's impact on sustainability under a tool for scientific analysis the Agency acknowledged was not controlling. Nonetheless, the Court will consider the challenge in the interest of completeness.

The "Cliff's Notes" version of the Agency's ICES analysis, as summarized in its brief is as follows:

> Under this framework, stocks without a recent time series of at least three population estimates are considered "data-poor." [Decision at 17450.] That describes the Sakhalin–Amur stock because there is no time series of recent estimates. Under the framework, if a stock only has one recent estimate, then PBR is appropriate only if that estimate is greater than 30% of the historical maximum size of the stock. *Id.*
>
> NMFS found that the 2010 minimum population size of the Sakhalin–Amur stock (2;972) was below 30% of 10,000 whales—which NMFS considered the "lower end of an historical maximum" for the stock based on the "reliable commercial harvest data" indicating that the stock was "at least" 13–15,000 whales during the period of intensive whaling prior to and just after WWII. AR17452. Therefore, PBR was not an appropriate measure of sustainability. *Id.*

(Doc. 59–1 at 30.)

The ICES framework "describes a set of tiered reference points to be used when scientists are required to provide advice ... in situations where data available to scientists are either data-rich or data-poor." (AR 8998 at 17324.) Under this framework, stocks without a recent time series of at least three population estimates are considered data-poor:

> For the marine mammal stocks that ICES provides quota advice on, a policy has been adopted (ICES 2005) that defines data-rich stocks as stocks whose abundance data have the following characteristics:
>
> a. Accuracy
>
> (i) Precision—abundance estimates should have a Coefficient of Variation about the estimate of 30%; and
>
> (ii) Abundance estimates should be unbiased.
>
> b. The most recent abundance estimates should be prepared from surveys and supporting data (e.g., birth and mortality estimates) that are no more than 5–8 years old. Surveys and associated data that are 8+ years old are too old to be considered as recent data (due to increasing imprecision as the data age). Therefore, a stock whose last abundance estimate is more than 8 years old, would not be considered to have a recent abundance estimate and would therefore, be considered data-poor.
>
> c. A tune series of at least three abundance estimates should be available spanning a period of 10–15 years with surveys separated by 2–5 years.

Stocks whose abundance estimates do not meet all these criteria are considered data-poor.

(AR 8998 at 17450.) In other words, if a stock only has one recent population estimate, PBR is appropriate only if that estimate is greater than 30% of the historical maximum size of the stock. NMFS concluded that the Sakhalin–Amur beluga stock is a data-poor stock under the ICES framework because "there is a 2010 abundance[25] estimate that meets the ICES standards [for the stock but] no other, similar abundance estimates [are] available from the last 10–15 years." (*Id.*)

Having determined the Sakhalin–Amur stock to be data-poor, NMFS next considered the ICES criteria to determine whether PBR is an appropriate measure of harvest/removal levels:

a. If a stock has no recent accurate abundance estimates, then no harvest should occur.

b. If a stock has 1–2 recent, accurate abundance estimates, then the criteria focuses on whether the abundance is less than or greater than 30% of the historical maximum such that:

(i) If abundance is greater than 30% of historical maximum, then the PBR protocol is used to set the harvest reference point (or quota); or

(ii) If abundance is less than 30% of the historical maximum then no harvest should occur.

(AR 8998 at 17450–17451.) Because the Sakhalin–Amur stock had a recent abundance estimate from 2010, NMFS reasoned that:

allowing harvests or removals at a PBR level under the ICES protocol is contingent upon the stock's abundance status with respect to the historical maximum. PBR would only be used under the ICES protocol if the current abundance is greater than 30% of the historical maximum.

(AR 8998 at 17451.) Thus, NMFS reviewed the population data and studies provided by Georgia Aquarium to determine the historical maximum for the Sakhalin–Amur stock:

The minimum current population estimate (Nmm) as of 2010 was in the range of 2,891–2,972 whales (Reeves et al 2011. Chelintsev and Shpak 2011). Using the existing estimate of 10,000 whales, this is below the ICES harvest reference point of 30%. However, the historical abundance maximum is likely higher than the 10,000. and therefore, the current abundance is likely even further below the 30% criterion established by ICES.

. . .

The limitations on the data available for this stock make it challenging to establish an historical maximum with any degree of certainty. However, we have little confidence in the estimate of 10,000 whales m the Sakhalin–Amur stock by Berzin and Vladimirov (1989) because of the high correction factor used. However, it is highly likely that an historical maximum of this stock is even greater than this estimate. Large-scale beluga whaling in Sakhalin Bay occurred over a period of 25–30 years prior to. and just after. World War II. The average annual take in this harvest was approximately 1,000 beluga whales ranging from 607–2,817 over a 20 year period (Shpak et al. 2011). By the early 1960s the harvest ceased when commercial pelagic whaling for larger species increased. Based on the more reliable commercial harvest data, the population had to be at least 13,000–15,000 whales during this period to support the removal of over 20,000 whales (average 1,000

25. "Abundance" refers to a population estimate.

whales per year for 20 years). Therefore, we consider 10,000 as below the lower end of an historical maximum.

(AR Doc. 8998 at 17451–17452.) As there was "no reliable estimate of a historical maximum," NMFS ultimately concluded that:

> Based on the ICES criteria for data-poor situations, no harvest should occur because the current abundance appears to be less than 30% of the lower end of a highly conservative historical maximum. The ICES framework thus supports our conclusion that the Application should be denied until such time that abundance information for the Sakhalin–Amur stock of whales improves to such a point that the impacts can be re-evaluated.

(AR 8998 at 17451–17452.)

Georgia Aquarium challenges NMFS's reliance on the ICES criteria to reject PBR and conclude that no belugas should be taken from the Sakhalin–Amur stock because (1) the ICES model has not been adopted by regulation as the U.S. standard, (2) in order to preclude the use of PBR, NMFS improperly compared the *maximum* possible value in a 7,000–10,000 population range to a *minimum* possible current population level (2,891–2,972) to determine a value below 30% [i.e., 29.72% = 2,972 ÷ 10,000 or 28.91% = 2,891 ÷ 10,000], (3) NMFS's estimate of the historic maximum population is wrong, and (4) NMFS failed to offer proof that the Sakhalin–Amur population is currently declining based only on evidence of a historical decline. Georgia Aquarium seeks to drag the Court through the weeds of NMFS's complex analysis in an effort to demonstrate the alleged arbitrary and capricious nature of the decision to use the ICES framework. In the hope of not losing the forest from the trees, the Court keeps in mind the central point of the Agency's conclusion—the lack of data to support the Aquarium's permit and data deficiencies in light of the purposes of the MMPA—while it unpacks NMFS's analysis in conjunction with the Aquarium's alleged errors.

Beyond arguing that the ICES criteria is not expressly incorporated into the MMPA regulations, Georgia Aquarium does not offer any reason or authority why NMFS's consideration of the ICES criteria in assessing sustainability of permitted activities is arbitrary and capricious. The United States has been a member of the International Council for the Exploration of the Sea (ICES) since 1912 with government delegates from the National Oceanic and Atmospheric Administration serving on the ICES Council.[26] Under 50 C.F.R. § 216.34(b), the Agency should also consider "the opinions or views of scientists or other persons or organizations knowledgeable of the marine mammals that are the subject of the application or of other matters germane to the application." And, under 50 C.F.R. § 216.33(e)(2)(iv), NMFS may consider "[a]ny other information or data .... deem[ed] relevant" in making a decision on a permit application. The Court defers to the Agency with regard to matters within its technical expertise and finds that NMFS properly exercised its discretion in relying on the special expertise of its Chief Science Advisor, Dr. Richard Merrick, who helped develop the ICES framework. (AR 9018 at 17725–28; AR 8914 at 13746, 13751.) *See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (courts are at their "most deferential" when reviewing predictions based on an agency's special exper-

**26.** The Court takes judicial notice of these facts, based on information available on NOAA and NMFS's official government webpages. *Available at* http://ices-usa.noaa.gov/ and http://www.nmfs.noaa.gov/ia/agreements/LMR% 20report/international council for the exploration of the sea.pdf.

tise); *Defenders of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1248 (11th Cir.2012); *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir.2009). The Agency's consideration of the ICES model therefore was not arbitrary and capricious.

Next, Georgia Aquarium asserts that comparing "a maximum possible population to a minimum possible population is a methodology that could never survive scientific peer review[,] is inherently arbitrary and capricious [and] shows that Defendants' attempt to rely on the ICES model is inappropriate." (Doc. 55–1 at 25.) According to Georgia Aquarium, "only by comparing the maximum possible value in a 7,000–10,000 population range to a minimum possible current population level (2,891–2,972) can Defendants squeeze a value below 30% [i.e., 29.72% (2,972 ÷ 10,000) or 28.91% (2,891 ÷ 10,000)] and thereby claim the ICES model precludes the use of PBR."[27] (*Id.*) If NMFS had instead made an "apples to apples comparison" by "comparing maximum possible populations, or even actual populations," Georgia Aquarium contends the result would show PBR as an appropriate measure. (*Id.*)

NMFS responds that its comparison of the Sakhalin–Amur stock's current minimum population size to an estimate of its historical maximum population size is the precise comparison required by the ICES criteria. (AR 8998 at 1745051 (summarizing ICES criteria as calling for a comparison of the current size of the stock to its historical maximum size).) The Aquarium asserts that comparing a "maximum" to a "minimum" is inappropriate "if one wants to know by what percent the population has actually increased or decreased." According to NMFS, the ICES criteria are not used for this purpose. Instead, NMFS explains, the ICES criteria are used to provide a conservative view of whether the stock's current size is below 30% of its historical level, before removals and other human-caused mortality. (AR 8998 at 17450–51 ("allowing harvests or removals at a PBR level under the ICES protocol is contingent upon the stock's abundance status with respect to the historical maximum").)

As further explained by NMFS, Georgia Aquarium's purported apples-to-apples comparison is, as one jurist might put it, "pure applesauce." *King v. Burwell*, ––– U.S. ––––, 135 S.Ct. 2480, 2501, 192 L.Ed.2d 483 (2015) (Scalia, J., dissenting) ("pure applesauce" is commonly interpreted to mean nonsense). According to NMFS, a "minimum" population estimate is more conservative (precautionary) compared to an "actual" estimate. "Minimum population estimate" is defined under the MMPA as "an estimate of the number of animals in a stock that is (1) based on the best available scientific information on abundance, incorporating the precision and variability associated with such information and (2) provides reasonable assurance that the stock size is equal to or greater than the estimate." 16 U.S.C. § 1362(27). The 2010 minimum population estimate

27. As NMFS notes in its response brief, "even the 3,961 [estimate] for the stock is only 30.5% of the bottom end of the stock's historical maximum ... which was "at least" 13–15,000 whales ... and is not a compelling basis for relying on PBR given the likely decline in the stock and the Aquarium's failure to account for other human-caused mortality." (Doc. 59–1 at 32, n. 7.) According to Intervenor–Defendants, "[i]t was not 'inherently arbitrary,' for NMFS to use the minimum abundance estimate, as there is just one recent abundance estimate for the Sakhalin–Amur stock. In addition, the Georgia Aquarium's preferred abundance estimate of 3,961 animals is still less than 26.5% of a 'highly conservative historical maximum' abundance estimate of 15,000 animals." (Doc. 61–1 at 41, n. 27.)

and Georgia Aquarium's preferred population estimate[28] of 3,961 whales—determined by Olga Shpak in conjunction with the IUCN review panel—were both derived from the same 2009–2010 survey data. As explained in the IUCN report proffered by the Georgia Aquarium, the "minimum population estimate (Nmin) is a lower 20th percentile of the estimated population size," and is a standard downward adjustment set by the U.S. Guidelines for the Assessment of Marine Mammal Stocks. (AR 8915 at 13788–90.) Both the PBR calculation set by the MMPA and the ICES framework use the more conservative and precautionary "minimum population estimate."

In short, Georgia Aquarium's contention that the Agency erred by using the statutory guideline for a "minimum population estimate" in evaluating the ICES framework has no basis. Therefore, the Court finds that NMFS reasonably used the 2010 minimum population estimate for the Sakhalin–Amur stock—the very same estimate that the Aquarium used for its proposed PBR calculation. (AR 8927 at 14335.) *See, e.g., Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1264 (11th Cir.2009) (stating that an agency action will be found arbitrary and capricious only when the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

The remainder of Georgia Aquarium's challenge to the ICES criteria focuses on a criticism of the specific underlying population estimates. Georgia Aquarium asserts that NMFS's "theory that the Sakhalin–Amur beluga population has declined by 70% [under the ICES framework] is based principally on the claim that the historic Sakhalin–Amur beluga population was 10,000" and that NMFS's "reliance on the 10,000 number is wrong." (Doc. 55–1 at 26–27.) A close reading of NMFS's decision reveals the fallacy in the Aquarium's argument—NMFS considered the 10,000 number offered by Georgia Aquarium in its application but determined it was likely inaccurate and relied on a higher number that NMFS found more supportable based on its consideration of all the population evidence.[29]

28. The 3,961 number is referred to as the "best" or "actual" estimate. Neither party explains what they mean by the use of the term "actual" estimate. The population estimate the parties refer to in the briefs as the "actual" estimate is referenced in the Administrative Record documents by Georgia Aquarium and Olga Shpak as the "best" estimate and is an averaged-corrected estimate. By "actual," the parties appear to refer to the estimate before it is reduced to the "minimum population estimate."

29. As indicated above, NMFS did not, in fact, use Berzin and Vladimirov's 1989 population estimate in its application of the ICES criteria, but instead noted that:

> The limitations on the data available for this stock make it challenging to establish an historical maximum with any degree of certainty. However, we have little confidence in the estimate of 10,000 whales in the Sakhalin–Amur stock by Berzin and Vladimirov (1989) because of the high correction factor used. However, it is highly likely that an historical maximum of this stock is even greater than this estimate. Large-scale beluga whaling in Sakhalin Bay occurred over a period of 25–30 wars prior to, and just after, World War II. The average annual take in this harvest was approximately 1,000 beluga whales ranging from 607–2,817 over a 20 year period (Shpak et al. 2011). By the early 1960s the harvest ceased when commercial pelagic whaling for larger species increased. Based on the more reliable commercial harvest data, the population had to be at least 13,000–15,000 whales during this period to support the removal of over 20,000 whales (average

The historical estimate of 10,000 comes from a 1989 report by Berzin and Vladimirov and was derived by multiplying the number of whales sighted on the surface during an aerial survey by a correction factor of 12 to account for unseen and submerged whales. (AR 8998 at 17451; AR 8920 at 13878). Georgia Aquarium's criticism of the Agency's reference to Berzin and Vladimirov's 10,000 number is perplexing, considering Georgia Aquarium itself relied on this number as an indication of the Sakhalin–Amur population in Appendix A–Chapter 3 of its permit application as shown below:

Chapter 3

***Beluga Whale Populations***

**Sakhalin Bay/Amur River**

> Belugas arrive in Sakhalin Bay and the mouth of the Amur River (Figure 3) in May where they first feed on early Amur smelt runs. Soon thereafter, they apparently switch to feeding on spawning herring, and then to mid-summer runs of pink salmon (Melnikov 1999). Berzin and Vladimirov (1989) stated that aggregations of 7,000 to 10,000 whales would form here, the largest group anywhere in the Sea of Okhotsk This summer aggregation has been the subject of multiple studies by Shpak et al. (2010, 2011).

(AR 8927 at 14316.)

Georgia Aquarium does not explain why NMFS's consideration of Berzin and Vladimirov's 1989 population estimate is in error.[30] Instead, it simply notes that Berzin and Vladimirov's methodology is starkly different from current population estimate methods by Shpak that used a correction factor of 2, and asserts that a comparison of various population estimates with different correction factors is "prejudicial, illogical, and analytically incorrect." (Doc. 55–1 at 28.) Georgia Aquarium posits that NMFS should have applied Berzin and Vladimirov's correction factor of 12 to Shpak's 2009–2010 survey data to "get a legitimate apples-to-apples comparison of data." (*Id.*) If NMFS had multiplied Shpak's number of beluga whales sighted on the surface by a correction factor of 12, Georgia Aquarium contends that "the [current] *actual* Sakhalin–Amur population [would be] 16,404, a significant increase from the *maximum possible* 10,000 historic number used by Defendants." (*Id.*) However, this contrived calculation ignores certain findings Georgia Aquarium in fact relied on in support of its permit application and recognized by NMFS in its denial decision, including (1) the findings of Georgia Aquarium's own expert, Shpak, who noted that the 12x correction factor is "probably far from valid," (AR 8927 at 14321), and (2) the IUCN panel's rejection of the use of a 12x correction factor for current population estimates or as a basis for comparing past population estimates based on the 12x factor. (*Id.*)

As noted by NMFS, more recent research indicates that the 12x correction factor used in the older surveys is likely inflated and because of the different survey methodologies used, it is not appropri-

1,000 whales per year for 20 years). Therefore, we consider 10,000 as below the lower end of an historical maximum.

(AR 8998 at 17451–17452.) Once again, this demonstrates that the Agency attempted to use its best judgment in assessing the data in light of the unreliability of Georgia Aquarium's population estimates of a historical maximum.

**30.** Georgia Aquarium notes that Berzin and Vladimirov's actual estimate provided a population range between 7,000–10,000, but that NMFS "cherry picked the data, choosing to not use the mid-point of the range, which would be customary, but instead choosing to use the maximum possible value of 10,000 to buttress its "declining population theory." (Doc. 55–1 at 28, n. 15.)

ate to substitute the correction factor from one study to another. (AR 8998 at 17451–17452.) According to NMFS, the correction factor was not the only difference between the past and more recent surveys—entirely different survey methodologies had been used which prevented any direct substitution of correction factors used for one survey with those used for another. Thus, it is not surprising that NMFS flatly denied Georgia Aquarium's assertion that the Agency made an improper comparison of the historic population estimate (using 12x correction factor) with the current population estimate (using 2x correction factor). According to NMFS, it was "well aware of the correction-factor issue and avoided it" in analyzing the available information on beluga whale population trends. (Doc. 59–1 at 22.)

Georgia Aquarium persistently asserts that NMFS's own words confirm that it *did* make the comparison:

> The minimum current population estimate (Nmm) as of 2010 was in the range of 2,891–2,972 whales (Reeves et al 2011. Chelintsev and Shpak 2011). Using the existing estimate of 10,000 whales, this is below the ICES harvest reference point of 30%.

(AR 8998 at 17451.) The flaw in this argument, however, is that when the statement is read in context and in its entirety, it is clear from the decision document that NMFS did not directly compare the 2010 Shpak population estimate to the 1989 Berzin and Vladimirov population estimate. As NMFS explains in its decision, while the 2010 Shpak population abundance estimate meets ICES standards, permitting "removals at a PBR level under the ICES protocol is contingent upon the stock's abundance status with respect to the historical maximum [but] there is no reliable estimate of a historical maximum"

for the Sakhalin–Amur stock. (AR 8998 at 17451.)

When NMFS plugged the 1989 (10,000) and 2010 (2,891–2,972) estimates into the ICES framework, the result was a current abundance below the ICES harvest reference point of 30%. (*Id.*) NMFS goes on to explain that:

> However, the historical abundance maximum is likely higher than the 10,000. and therefore. the current abundance is likely even further below the 30% criterion established by ICES.
>
> . . .
>
> There are significant differences between the 1989 estimates of beluga whales in the Sea of Okhotsk and the results of the more recent surveys.
>
> . . .
>
> The use of different survey methodologies and application of correction factors between surveys, at a minimum, complicates a direct comparison between the results. Shpak et al. (2011) noted that the 1989 estimate is likely inflated (due to a correction factor of 10–12X). Shpak et al. (2011) used varying correction factors depending on the stock surveyed. Therefore, a direct comparison of the estimates is not possible.

(AR 8998 at 17451.) Georgia Aquarium's reliance on *Native Village of Chickaloon v. Nat'l Marine Fisheries Service,* holding that "significant mathematical errors can render an agency decision arbitrary and capricious" is therefore inapplicable. 947 F.Supp.2d 1031 (D.Alaska 2013) (finding that the agency's "take calculations are clearly erroneous because they inexplicably mix corrected population abundance figures with uncorrected survey density estimates, thereby failing to adequately calculate that which the agency was actually trying to calculate"). Accordingly, the Court finds that NMFS provided a reasoned basis for its consideration of the

ICES framework in order to determine whether Georgia Aquarium's proposed permit would not likely have a significant adverse impact on the Sakhalin–Amur beluga whale stock.

Georgia Aquarium's final argument, that NMFS failed to offer proof that the Sakhalin–Amur population is currently declining, evidences its misunderstanding of the purpose of the MMPA and its own burden in seeking a permit under the statute's issuance criteria. In its analysis of the population studies and data submitted by Georgia Aquarium, NMFS found that:

> Even if we were to accept the Aquarium's PBR-based analysis of sustainability despite the flaws identified above, an underlying assumption in the application of the PBR equation is that the stock will naturally grow and that some surplus growth may be removed while still allowing recovery. However, with only one recent abundance estimate to rely on and no trend data to establish that the stock is increasing, the use of PBR as an index of sustainability in this case is not appropriate. The historical information required to support the Aquarium's assertion (using PBR) that this import will meet the MMPA criterion is lacking. In fact, we developed three scenarios that, taken together, suggest to the contrary—that is, that the stock is either declining or stable, but is not increasing. Moreover, the two more plausible scenarios suggest human-caused removals well m excess of those resulting from live captures, thereby raising additional doubts about the Aquarium's exclusive focus on those removals in then PBR-based analysis.
>
> The current abundance estimate for Shantar Bay (6,661) is approximately twice as big as the Sakhalin–Amur stock (1,891–2,972). However. Berzin and Vladimirov suggested that, at least on a relative scale, the Sakhalin–Amur aggregation in 1989 was larger than that found in the Shantar Bay region This suggests that some factor or factors have affected one. or both, of these stocks over the past two decades to the point where the Sakhalin–Amur stock is no longer the largest aggregation in the Sea of Okhotsk. This inconsistency between past and present further highlights the data-poor resource status of this stock and the uncertainty associated with the information available to review this application.

(*Id.* 17447.) NMFS then discussed its evaluation of three scenarios to determine how the population of this stock may have been impacted over time and concluded that "[a]ll three scenarios pointed to a decline in the stock"—

> All scenarios suggest that something in addition to the reported level of live-capture removals has limited the growth of the Sakhalin–Amur stock since 1989. The removals for live-capture of the beluga whales from the Sea of Okhotsk at the levels reported from 2000–2011 should not impede the stock's growth or recovery. If the removal of beluga whales for public display were the only source of mortality or removal from this stock, then it should be increasing at a slow rate. However, based on an integration of all the available data, we believe that total removals from the Sakhalin–Amur stock have exceeded PBR. and likely the total net production, on a regular basis resulting in a small but steady and significant decline over the past two decades. As indicated above, there are several potential sources of human-caused mortality that may have produced this decline, and the live captures of beluga whales cannot be discounted as a possible contributing factor. Regardless of the source of the decline, the result is a net loss of whales per year throughout the 20 year period which has gone unde-

tected because of the lack of monitoring in this region during this period. Since the available information does not support a conclusion that the stock is stable or increasing, the record does not support a finding that the proposed activity is sustainable on the basis of the Aquarium's PBR-based analysis.

(AR 17449–17450.)

Evidence in the record submitted by Georgia Aquarium in conjunction with its permit application, supports NMFS's finding that the Sakhalin–Amur beluga stock is likely declining.[31] The IUCN Report on which Georgia Aquarium relies in support of its request, notes:

> Belugas in the Sakhalin–Amur region were intensely exploited from 1915 at least through 1937 ... and it appears that whaling stopped at least partly because few whales were left to catch.[32] Some beluga populations that were reduced to low numbers have failed to recover at the expected 4% default annual rate after exploitation stopped (citing examples in Cook Inlet, Alaska and St. Lawrence estuary, Quebec) [and] from their example it appears possible—especially in view of the total reported catches from 1927 to 1937 ...—that recovery of the Sakhalin–Amur stock has been slow and is still not complete, and that the present status should be considered at best as "unknown."

(AR 8915 at 13789.) The Marine Mammal Commission ("MMC"), on which Georgia Aquarium relies as recommending the use of PBR in this case, also stated in its comments to NMFS on Georgia Aquarium's permit application:

> **Status of the source population and the effects of removing the whales**
>
> Section 102(b)(3) of the Marine Mammal Protection Act prohibits the importation of marine mammals taken from a stock that has been designated by the Secretary of Commerce (in this case) as depleted. The only beluga whale population that has been designated as depleted is that in Cook Inlet, Alaska. Thus, the Act does not explicitly prohibit the importation of beluga whales from the populations in the Sea of Okhotsk.
>
> Nevertheless, in the past both the Commission and the Service have taken the position that an applicant (and/or the Service as the decision-maker) has an obligation to demonstrate that the affected stock is not depleted before taking or importation can be allowed, even if no formal depletion designation has been made. Good policy reasons support this—we do not want to promote removals from unhealthy or potentially unhealthy populations simply because we do not have sufficient information to make a formal depletion designation.
>
> ...
>
> The second task is to judge whether the Sakhalin–Amur aggregation can withstand such removals and maintain itself in a healthy state if it currently is healthy, or can recover to a healthy state if it is not. In the United States, the level that is used for distinguishing healthy from depleted marine mammal populations is 60 percent of the carrying capacity (Fed.Reg. 41:55536). In this case, the population's size is not known

31. Georgia Aquarium's own permit application admits in its PBR calculation that the recovery factor "for a stock of unknown recovery status ... applies to the Sea of Okhotsk beluga whales for, although they are not listed as threatened or endangered, the populations have been depleted, and their recovery trajectory is unknown." (AR 8927 at 14335.)

32. As another section of the IUCN report recounts "[h]undreds of thousands of belugas were taken each year ... Melnikov (1999) reported that hunting of belugas in the Okhotsk Sea ceased by 1963 because there were few left to catch and because of the expansion of commercial whaling for large whales." (AR 8915 at 13784.)

relative to its historic carrying capacity. Past hunting records indicate that the population may have been much larger at one time and those records, combined with the current abundance information indicate that the population may well be below 60 percent of its historic carrying capacity, or even below 50 percent as used by the International Union for Conservation of Nature (IUCN) panel that reviewed the effects of removal on this population (Reeves et al. 2011). The existing data also are not sufficient to determine with confidence whether the population is growing, stable, or declining or is affected substantially by other human-related sources of mortality or removal.

(AR 8730 at 10094.)[33] Finally, a 2012 article in the Journal of Marine Biology produced by Georgia Aquarium in response to public comments on its permit application on "Social and Behavioural Factors in Cetacean Responses to Overexploitation"[34] describes the effects on beluga whale populations as follows:

> Belugas have been heavily exploited in much of their range, often over timescales of hundreds of years. In at least two areas ... they were essentially extirpated by commercial whaling ... Although similar hunting techniques were practice in many other areas (e.g., ... and the Okhtosk [sea]) at least relict numbers of belugas survived so that the populations in those area are still extant ... Several other areas where large beluga populations were greatly depleted by hunting ... have been monitored periodically, and there is no clear evidence of sustained recovery by any of those populations. Importantly, none of the once-large beluga populations in northern Russia has been monitored rigorously for trends following decades of intensive exploitation under the Soviet regime. We are aware of only one example where there is direct evidence for a beluga population increase. The results of aerial surveys of inner Bristol Bay (Alaska) between 1993 and 2005 have been interpreted as suggesting that the local population of belugas increased during that period at a rate of nearly 5% per year. In this instance, however, there was no history of intensive exploitation, no tradition of using drive or net techniques leading to mass removals, and no reason to believe the population had been seriously depleted prior to 1993.

(AR 8934 at 15868–15869.)

The question is not whether NMFS offered conclusive proof that the Sakhalin–Amur stock was declining in population. The question is whether Georgia Aquarium demonstrated, as it was required to do, that its requested import was consistent

33. Although the MMC accepted the IUCN panel's PBR and finding that "the population is likely to be able to tolerate removals on the order of those from the past decade," it went on to note that "the use of PBR in this case also presents certain problems," including that (1) there is "not ... a good understanding of the population's abundance and trend," (2) "if the population is declining, using an assumed maximum an assumed maximum growth rate [as done here] would be inappropriate," and (3) PBR "is intended to account for all human-related removals from a population [and] the information needed to evaluate other sources of human-related mortality is largely anecdotal or consistent with an 'absence-of-evidence' argument, which does not provide a basis for a compelling argument." (AR 8730 at 10095.)

34. According to Intervenor–Defendants the lead author of this report is a scientist with NMFS and the second author, Randall Reeves, is the head of the IUCN panel that reviewed Georgia Aquarium's beluga population research. Randall Reeves is also a member of the Marine Mammal Commission established by the MMPA to review import permits.

with the purposes of the MMPA to protect marine mammal species and population stocks that "are, or may be, in danger ... depletion as a result of man's activities" and to prevent population stocks from "diminish[ing] below their optimum sustainable population." 16 U.S.C. §§ 1361(1), (2) & (6). NMFS did not need to offer any proof that the Sakhalin–Amur stock was not increasing as Georgia Aquarium suggests in this appeal—Georgia Aquarium offered all the proof needed to support NMFS's conclusions. Thus, it cannot be said that NMFS offered an explanation for its decision that runs counter to the evidence before the Agency. *See, e.g., Miccosukee Tribe of Indians of Florida*, 566 F.3d at 1264.

**D. NMFS's use of Georgia Aquarium's calculated PBR level against which to compare the proposed takes was not arbitrary and capricious**

Georgia Aquarium's final argument regarding PBR is that NMFS departed from its normal practice when computing the PBR against which to measure the proposed takes:

> The Aquarium's permit application presented the very conservative PBR calculated by the IUCN panel (30) rather than the higher PBR that would normally be calculated by Defendants under the MMPA for the Sakhalin–Amur beluga population (46). A.R. Doc. 8934 at 15790. The Aquarium assumed and was entitled to rely on the presumption that Defendants would follow their customary MMPA practice when calculating the PBR number against which to compare removals. A.R. Doc. 8933 at 14724–25. But that expectation was dashed when Defendants again departed from their established practice. If Defendants had used the PBR calculation methodology they employ under the MMPA, the PBR would have been 46, not 30. A.R. Doc. 8933 at 15686.

(Doc. 55–1 at 38–39.) According to the Aquarium's brief, when NMFS calculates actual population levels under the MMPA for non-endangered beluga whale populations in Alaska's Chukchi and Bering Seas, it multiplies the number of whales sighted on the surface by 2.62 to account for unseen, submerged whales and by 1.18 to account for difficult to see dark-colored juveniles. (AR 8933 at 15686.) If NMFS had followed this practice and used these correction factors to calculate the population numbers for the PBR formula, Georgia Aquarium asserts the annual PBR for the Sakhalin–Amur area would be 46. (*Id.* at 38, n. 26.)

This ship has sailed. Georgia Aquarium proposed the use of a PBR level of 30 in its own permit application. As the Aquarium's permit application states, "[a]s described in Appendix A accompanying this permit application, subsequent research and data analysis recommended by the IUCN panel indicate that the appropriate PBR is 30." (AR 8927 at 14296.) NMFS maintains that there is no MMPA practice of using a specific fixed survey correction factor for beluga whales as Georgia Aquarium contends—as is evidenced by the IUCN's discussion of various potential correction factors. Rather, "that is a scientific question for researchers in the field, not a matter of agency 'practice.'" (Doc. 59–1 at 42.) NMFS relied on the Shpak survey estimates provided by Georgia Aquarium as peer reviewed by the IUCN in support of the Aquarium's PBR calculation. As noted in Georgia Aquarium's permit application, Shpak used a correction factor of 2.27x for her population estimates, which was lowered to a correction factor of 2x by the IUCN panel, and that was the correction factor ultimately used by Georgia Aquarium in determining the minimum population estimate for its PBR formula. (AR 8927 at 14321, 14336.) Had

Georgia Aquarium assumed it was entitled to rely on a different PBR calculation, it could have proposed that calculation to NMFS for consideration. Accordingly, there is no basis to conclude that NMFS made a clear error of judgment in its consideration of the PBR expressly proposed by the applicant in its permit decision.

**II. NMFS's finding that Georgia Aquarium failed to show that the granting of its import permit would not likely result in additional captures of beluga whales from the Sakhalin–Amur stock beyond those authorized by the permit was not arbitrary and capricious**

The second permitting criteria at issue in this appeal, 50 C.F.R. § 216.34(a)(7), requires the permit applicant to show that "[a]ny requested import or export will not likely result in the taking of marine mammals or marine mammal parts beyond those authorized by the permit." NMFS interprets this regulation to require the permit applicant to show that "the import or export is not likely to result in replacement takes or otherwise increase demand for protected species or protected species parts resulting in takes to meet such anticipated demand." (AR 8998 at 17424.) To demonstrate compliance with this regulation in past import permit applications, NMFS had required confirmation or assurance from the prospective permittee that "the foreign shipping facility will not replace these animals with additional animals of the same species." (A.R. Doc. 8998 at 17424.)

In its permit application, Georgia Aquarium included a "Statement on Replacement of the Animals" as follows:

> This importation will not result in the taking of beluga whales from the wild to replace the animals to be imported. The Russian authorities at Rosprirodnadzo (the Russian "Ministry of Fishery"), a department of the Ministry of Nature Protection, issue a maximum number of capture permits each year which has ranged from 40 to 57 (Shpak et al. 2011), but that quota has never been fulfilled during this time. This quota will not change due to the importation of belugas under this permit. Additionally, there is no public display component associated with UMMRS. It is strictly a research facility with significant security.
>
> It is not anticipated that the importation of 18 beluga whales under this permit will result in a greater demand for marine mammals. One of the purposes of the permit activity is to increase the population of reproductively viable beluga whales in the North American beluga breeding cooperative to a level that is self-sustaining. As described in Appendix E, Alternatives Analysis, accompanying this permit application, recent population models have indicated that the present population of whales in the North American beluga breeding cooperative has a 56% probability of declining over the next 30 years if they are not supplemented and continue to be managed as they have been for the last five years. Thus, by supplementing the North American beluga breeding cooperative with the 18 whales proposed for import and enhancing the captive breeding program, the permit activity will reduce the demand for wild-caught beluga whales for public display.

(AR 8927 at 14294.)

NMFS denied Georgia Aquarium's permit, finding that the Aquarium "had not demonstrated that the import will not result in taking of marine mammals beyond those authorized by the permit" because "additional beluga whales are likely to be captured as part of the ongoing, legal marine mammal capture operation in Russia:"

**NMFS determination:** The Aquarium has not demonstrated that the import will not result in taking of marine mammals beyond those authorized by the permit. In fact. additional beluga whales are likely to be captured as part of the ongoing, legal marine mammal capture operation in Russia.

The Aquarium indicated that it is unlikely that other U.S. facilities would submit applications to NMFS to import additional beluga whales for public display in the near future. However, the point of this criterion is that the foreign shipping facility will not replace these animals with additional annuals of the same species.

In the 1993 Proposed Rule to amend NMFS regulations for permits to take or import marine mammals for the purposes of scientific research, public display, or enhancing the survival of a marine mammal species or stock, this criterion included an explanation that "the import or export is not likely to result in replacement takes or otherwise increase demand for protected species or protected species parts resulting in takes to meet such anticipated demand." That explanation was not included in the Final Rule: however, we believe it describes the intent of this criterion and we have applied it as such in past decisions.

In the past, we have required confirmation from exporting parties (i.e., the foreign facility that is shipping marine mammals to the U.S.) that they have no intention of replacing the animals they are exporting with animals of the same species. For previous imports of beluga whales (from Mexico. Germany, and Canada), the shipping facilities in those countries have provided assurances that additional animals would not be acquired as a result of the import.

This case is somewhat different, in that the ongoing, legal marine mammal capture operation in Russia is expected to continue. Thus, we cannot obtain the assurance that an additional 18 whales would not be captured in the future in place of the 18 whales requested for import. If these 18 beluga whales are not imported to the U.S. they could be made available to public display facilities in other countries and it is possible that 18 fewer beluga whales would be captured in Russia to supply other facilities.

(AR 8998 at 17424.)[35]

Live captures of beluga whales began in the Sakhalin Bay region in 1986 and have been ongoing for 30 years. Since 1992, when Canada ceased its live capture operations, Russia has been the sole regular

35. Georgia Aquarium cites extensively in its brief to the Draft Environmental Assessment prepared by NMFS staff based on a preliminary recommendation to approve the permit. After questions were raised by others higher up in the agency and after consultation with the Agency's chief science advisor, NMFS ultimately decided to deny the permit. Thus, the Court does not give much weight to positions taken in a draft document that were reconsidered and rejected by the Agency's Administrator. "Judicial review of agency action should be based on an agency's stated justifications, not the predecisional process that led up to the final, articulated decision." *Ad Hoc Metals Coal. v. Whitman,* 227 F.Supp.2d 134, 143 (D.D.C.2002) (citing *PLMRS Narrowband Corp. v. FCC,* 182 F.3d 995, 1001 (D.C.Cir.1999)). The fact that NMFS changed its mind is something that, as long as the proper procedures were followed, it was fully entitled to do. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 658–59, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007). "The federal courts ordinarily are empowered to review only an agency's final action, *see* 5 U.S.C. § 704, and the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious.". *Id.*

supplier of belugas to the public display industry. (AR 8998 at 17444 (citing Fisher and Reeves, 2005).) Between 1990 and 2010, the World Conservation Monitoring Center recorded the export of at least 237 live belugas from the Russian Federation. (*Id.*) In 2011, one study indicates that the Russian annual quota for live captures was somewhere between 40 and 57 whales. (AR 8998 at 17445; AR 9221 at 21548–21551.)[36]

Thus, unlike the previous import permits for beluga whales where confirmation was provided by the exporting facilities that there was no intention on their part to replace the exported animals, NMFS recognized this case as different "in that the ongoing, legal marine mammal capture operation in Russia is expected to continue [and] we cannot obtain the assurance that an additional 18 whales would not be captured in the future in place of the 18 whales requested for import." (*Id.*) For example, in 2004, NMFS granted a permit to SeaWorld to import a beluga whale and dolphin from the Duisburg Zoo in Germany for purposes of improving their quality of life at SeaWorld's facility. (*See* Doc. 86–1.) SeaWorld obtained a written letter from the Director of the Duisburg Zoo that the zoo "has no intentions of acquiring substitute animals for either species form the wild or from other facilities. The long term collection planning for the zoo does not include keeping either species in the future." (*Id.* at 6.) Subsequently in 2005, NMFS granted Georgia Aquarium a permit to import two beluga whales, as a medical rescue, from a Mexican Aquarium. (*See* Doc. 60–1.) In conjunction with that permit application, Georgia Aquarium secured a written confirmation from the Mexican aquarium that it had no intention of acquiring additional belugas to be housed at its facility as replacement for the two belugas sold to Georgia Aquarium. *Id.* Similarly, In 2006, NMFS granted a permit to SeaWorld to import captive-bred beluga whales from Marineland of Canada where the application provided that "[t]he importation will not result in the collection of beluga whales from the wild nor will replacement animals be collected for Marineland Niagara." *See* Permit Application *available at* http://www.nmfs.noaa.gov/pr/pdfs/permits/seaworld_116-10084.pdf. Because Georgia Aquarium could not provide assurance that the Russian facility would not replace the 18 imported beluga whales with additional takes from the same stock, NMFS concluded that the Aquarium did not meet the statutory requirement under 50 C.F.R. § 216.34(a)(7).

Georgia Aquarium challenges the denial of its permit application, contending that NMFS (1) improperly interpreted 50 C.F.R. § 216.34(a)(7) by applying the MMPA extraterritorially, (2) improperly relied on a proposed rule that was not adopted for its replacement take requirement, and (3) applied the wrong standard and incorrectly concluded that Georgia Aquarium's permit would likely result in replacement takes.

### A. NMFS's interpretation of 50 C.F.R. § 216.34(a)(7) as prohibiting replacement takes is not an improper extraterritorial application of the MMPA

"An agency's interpretation of its own regulations is 'controlling unless

36. The Court notes that both the Georgia Aquarium's permit application and NMFS's decision document erroneously cite to the 2011 Shpak report for this data, instead of the 2013 report. In addition, the information in the Shpak report indicates that higher quotas for live-capture (ranging from 150 to 1,000 in various years from 2006 to 2013) were issued for this stock, although the Court cannot determine for certain from the report whether these higher quotas existed for different regions in the Sea of Okhostk. (*See* AR 9221 at 21548–21551.)

plainly erroneous or inconsistent with the regulation.' " *Sierra Club v. Johnson,* 436 F.3d 1269, 1274 (11th Cir.2006) (quoting *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)). Georgia Aquarium argues that NMFS's interpretation of 50 C.F.R. § 216.34(a)(7), which requires that a foreign nation and its citizens "must agree to not collect or export other animals of that species" before NMFS will allow the import of animals collected in a foreign nation, is plainly erroneous as an improper extraterritorial application of the MMPA. (Doc. 55-1 at 48-49; Doc. 84 at 34-37.) On the surface, Georgia Aquarium's extraterritorial argument has some base level of persuasive value. However, upon diving deeper into the analysis of the issue, the logic of that argument evaporates.[37]

The Supreme Court has repeatedly recognized that although "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States, ... that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *E.E.O.C. v. Arabian Am. Oil Co. ("Aramco"),* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991), *superseded by statute on other grounds by Arbaugh v. Y & H Corp.,* 546 U.S. 500, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (citing *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 284-285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). Courts therefore "assume that Congress legislates against the backdrop of the presumption against extraterritoriality"[38] unless Congress has clearly and affirmatively expressed an "indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." *Id.*

Georgia Aquarium relies on *United States v. Mitchell,* 553 F.2d 996 (5th Cir. 1977) as support for its assertion that the MMPA was not intended to apply to conduct in foreign countries. In *Mitchell,* the court addressed the question of the extraterritorial scope of the MMPA in the context of a criminal prosecution of an American citizen who, pursuant to a permit from the Bahamian government, captured 21 dolphins within the territorial waters of the Bahamas on behalf of a Bahamian citizen for the purpose of exporting the dolphins to Great Britain. Mr. Mitchell challenged his criminal convictions[39] argu-

37. In perhaps the most incisive explanation of this issue, Intervenor-Defendants explain that NMFS's interpretation does not require a foreign sovereign to prohibit live captures, "but rather requires a U.S. facility applying for a U.S. permit to: (1) obtain assurances from its private, foreign business partner, that the partner does not plan to capture, or acquire additional wild-caught, marine mammals from the relevant stock because of the proposed import, and (2) analyze whether its proposed import will contribute to demand for live captures from the relevant stock." (Doc. 61-1 at 48.)

38. "Extraterritoriality is 'essentially, and in common sense, a jurisdictional concept concerning the authority of a nation to adjudicate the rights of particular parties and to establish the norms of conduct applicable to events or persons outside its borders. More specifically, the extraterritoriality principle provides that "[r]ules of the United States statutory law, whether prescribed by federal or state authority, apply only to conduct occurring within, or having effect within, the territory of the United States." ' " *Environmental Defense Fund, Inc. v. Massey,* 986 F.2d 528 (D.C.Cir. 1993) (citations omitted).

39. In a 32-count indictment, the government charged Mitchell with taking the dolphins in violation of an NMFS regulation prohibiting, without geographic restriction, all unauthorized takings of marine mammals by United States citizens. The indictment also charged Mitchell with unlawfully possessing, transporting, and selling the animals in violation of a separate regulation prohibiting the possession, transport, or sale of marine mammals taken in violation of the Act and its regulations. The jury found Mitchell guilty of twen-

ing that the criminal prohibitions of the Act should not apply extraterritorially to conduct wholly within another sovereignty. *Mitchell* found that neither the text nor the legislative history of the MMPA attempted to define the geographic scope of the moratorium on the taking and importing of marine mammals in Section 1371. *Id.* at 1000.[40] In contrast, the separate taking prohibitions set forth in Section 1372[41] contained "clear geographic scope"—i.e., as extending only to the taking of any marine mammal "on the high seas ... or from the waters or on lands under the jurisdiction of the United States." *Id.* Thus, the *Mitchell* court held that:

> when Congress did define the geographic scope of the prohibitions in section 1372, it did not make conduct in foreign territory unlawful. Takings without permits were prohibited only in United States territory and on the high seas. The omission of the territory of other sovereigns permits the reasonable inference that Congress concluded the prohibitions should not extend extraterritorially.

*Id.* at 1004.

In response, NMFS asserts not that the MMPA was intended to apply extraterritorially, but that the presumption against extraterritoriality has no application to its denial of a permit to import the whales into the U.S. "By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders." *Stevens v. Premier Cruises,* 215 F.3d 1237, 1242 (11th Cir.2000) (quoting *Environmental Defense Fund, Inc. v. Massey,* 986 F.2d 528, 531 (D.C.Cir. 1993) and *Reyes–Fuentes v. Shannon Produce Farm,* 671 F.Supp.2d 1365, 1371 (S.D.Ga.2009)). Thus, "the presumption against extraterritoriality is not applicable when the conduct regulated by the government occurs within the United States ... Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States." *Environmental Defense Fund, Inc. v. Massey,* 986 F.2d at 531–32; *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 921–922 (D.C.Cir. 1984) ("In the context of remedial legislation, prohibition of effects is usually indivisible from regulation of causes ... Territoriality-based jurisdiction thus allows states to regulate the conduct or status of individuals or property physically situated within the territory, even if the effects of the conduct are felt outside the territory ... Conversely, conduct outside the territorial boundary which has or is intended to have a substantial effect within the territory may also be regulated by the state.")

Because the whales are to be imported into the United States, NMFS's interpretation of 50 C.F.R. § 216.34(a)(7) is that

ty-three counts, as well as of one count of conspiracy to violate the Act and the regulations, but acquitted him of eight counts of taking, possessing, transporting, and selling six dolphins in violation of the MMPA sections prohibiting takings on the high seas, possession of illegally taken mammals, and transport or sale of such mammals.

40. The court found that it was unclear from the legislative history "whether the moratorium was intended to have broader territorial effect than the prohibitions, which do not reach conduct in the territory of other sovereigns." *Id.*

41. Section 1372 prohibits the use of "any port, harbor, or other place under the jurisdiction of the United States to ... import marine mammals or marine mammal products" except as pursuant to a permit issued under section 1374 or "an international treaty, convention, or agreement." 16 U.S.C. § 1372(a)(2)(B).

the MMPA regulates U.S. importing practices, not foreign conduct. In denying Georgia Aquarium's import permit, NMFS applied the MMPA to Georgia Aquarium only, not a foreign country or its citizens. Georgia Aquarium's arguments attempt to confuse the regulated conduct with the foreign effects of that regulation. As the D.C. Circuit recognized in *Animal Welfare Inst. v. Kreps,* "the MMPA addresses not only the killing of marine mammals by Americans but also the importation of them. This reflects a congressional decision that denial of import privileges is an effective method of protecting marine mammals in other parts of the world. This conclusion is supported by the legislative history." 561 F.2d 1002, 1010 (D.C.Cir.1977).[42]

Thus, Georgia Aquarium's reliance on *Mitchell* does not resolve the question before this Court. In *Mitchell,* the court found that the MMPA could not be applied extraterritorially to criminalize an American citizen for his conduct in another country. *Mitchell* does not in any way touch on Georgia Aquarium's argument here—that NMFS's application of the MMPA's import prohibitions are being extraterritorially applied to bar the conduct of a foreign country. Unlike this case, *Mitchell* did not involve an attempted import of the dolphins into the U.S. Indeed, the conduct in *Mitchell* bore no ties to the U.S. other than being carried out by an American citizen who planned to establish a dolphin-capturing business outside of the U.S. Thus, the court:

> [could] not say that the interests of the United States in preserving dolphins outweighs the interest of the Commonwealth of the Bahamas in preserving its character as a tourist attraction by the issuance of a limited number of permits for the capture of dolphins within its narrow band of territorial waters.

553 F.2d at 1004. In *Mitchell,* both the conduct and its effects occurred wholly in a foreign country. Here, Georgia Aquarium is seeking to import the whales into the U.S.—the precise conduct being regulated by NMFS. Any incidental effect on the Russian capture operation caused by conditions placed on any import permit do not result in an improper extraterritorial application of the Act because the import occurs wholly within the U.S. *Environmental Defense Fund, Inc. v. Massey,* 986 F.2d at 531. Contrary to Georgia Aquarium's arguments, NMFS's denial was focused on the discrete act of importation—which primarily occurs in this country, not extraterritorially. NMFS's permit denial is thus not inconsistent with *Mitchell.*

Georgia Aquarium goes overboard in its argument that in denying its import permit, NMFS "demand[ed] that Russia and its nationals cease collecting and exporting beluga whales" and that such demands "effectively precludes U.S. facilities from seeking to import such animals in the future" in violation of the MMPA which "allows for the continuing import of marine mammals for public display in the United States." (Doc. 55–1 at 49 (arguing that "it defies logic to assert Congress intended to prevent public display facilities from importing animals by requiring that a country with a live capture program for public

42. Georgia Aquarium flounders in its attempts to distinguish *Kreps.* It asserts that *Kreps* is distinguishable because the South African seal harvest was intended to supply the U.S. market whereas here, belugas collected by Russia may be exported to any number of foreign nations. The court's rationale in *Kreps,* although applied in the specific context of the South African seal harvest, extended to the central purpose of the MMPA as applied to marine mammal importing generally. There is no indication in the decision that the seal harvest supplied only U.S. consumers. Thus, Georgia Aquarium's proffered distinction between the foreign shippers' targeted consumers is unavailing.

display terminate its program upon exporting an animal(s) to the United States").) Although NMFS noted that it could not approve the permit in the absence of confirmation or assurance that additional belugas would not be captured, NMFS did not find any foreign conduct unlawful or require any foreign nationals to halt any activity as Georgia Aquarium argues. Indeed, NMFS admitted in its permit denial that the Agency does not have the jurisdiction to regulate capture activities in Russia. (AR 8998 at 17437.) NMFS also expressly recognized and referred to the Russian live-capture operation as legal under Russian laws in its decision document.

In addition, Georgia Aquarium's arguments presume that—contrary to the express purpose of the MMPA—the limited exceptions for public display and scientific research permits in section 1374 opened the floodgates for unfettered importation of marine mammals. Nowhere does the MMPA "allow[ ] for the *continuing* import of marine mammals for public display in the United States" or the unfettered right to such importation. (Doc. 55-1 at 49) (emphasis in original). Instead, section 1374's permitting scheme sets forth exceptions to the moratorium on the taking and import of marine mammals for purposes of public display if certain requirements of the MMPA are met. NMFS's interpretation of the issuance criteria in 50 C.F.R. § 216.34(a)(7) is not read in vacuum. Considered in conjunction with the other issuance criteria, without sufficient population data necessary to support a sustainable live-capture operation of a likely depleted stock with government-issued quotas above the Aquarium's own calculated PBR, NMFS reasonably determined that Georgia Aquarium failed to demonstrate that its permit would not result in the taking of additional animals beyond those authorized by the permit.

For these reasons, the Court rejects Georgia Aquarium's argument that NMFS's interpretation of 50 C.F.R. 216.34(a)(7) is an improper extraterritorial application of the MMPA.

### B. NMFS's interpretation of 50 C.F.R. 216.34(a)(7) as requiring Georgia Aquarium to demonstrate that the permit would not likely result in replacement takes was not arbitrary and capricious

In denying Georgia Aquarium's permit application based on its failure to show that "the import ... is not likely to result in replacement takes or otherwise increase demand for [the] protected species ... resulting in takes to meet such anticipated demand," NMFS relied in part on a parenthetical example in the text of a 1993 Proposed Rule. (AR 8998 at 17424). NMFS acknowledges that the "replacement take" language was not included in the final regulation, but according to NMFS it "describes the intent of this criterion" and has been consistently applied by NMFS in past permit decisions. (*Id.*)

In its permit application, Georgia Aquarium accepted NMFS's interpretation of the criterion in 50 C.F.R. § 216.34(a)(7) as requiring a showing that the permit will not contribute to "replacement takes" by incorporating that terminology in its permit application. (AR 8927 at 14294.) Now on appeal, Georgia Aquarium challenges NMFS's reliance on a proposed rule that was never promulgated. (Doc. 55-1 at 43-44.) The 1993 Proposed Rule covered expansive revisions to the MMPA,

> to update[ ] and consolidate[ ] the regulations for special exception permits to: [t]ake, import, export, or carry out any other otherwise prohibited act involving marine mammals for the purposes of scientific research, enhancing the survival or recovery of a marine mammal

species or stock (enhancement), educational and commercial photography, and public display under the Marine Mammal Protection Act of 1972 (MMPA); take, import, export or carry out any other otherwise prohibited act concerning endangered or threatened marine mammals for scientific purposes or enhancement under the Endangered Species Act of 1973(ESA); and, determine the status and disposition of rehabilitated stranded marine mammals" and "sets forth revised procedures for these permits in order to make administration of the NMFS marine mammal permit program more efficient, consistent, and predictable.

61 Fed.Reg. 21926, 21926 (May 10, 1996).

The squabble is this. The portion of the 1993 Proposed Rule regarding permit issuance criteria provided that for the issuance of a special exception permit, the applicant must demonstrate that "[g]ranting any requested import or export is not likely to result in a take of protected species or protected species parts other than that authorized by the permit (*e.g., the import or export is not likely to result in replacement takes or otherwise increase demand for protected species or protected species parts resulting in takes to meet such anticipated demand*)." 58 Fed.Reg. 53320, 53342 (Oct. 14, 1993) (emphasis added). The Final Rule provides that for any permit issued under the MMPA, the applicant must demonstrate that "any requested import or export will not likely result in the taking of marine mammals or marine mammal parts beyond those authorized by the permit." 61 Fed.Reg. at 21936. The text of the final regulation is virtually the same as the proposed rule but for the omission of the underlined explanatory "e.g." parenthetical.

Georgia Aquarium asserts that because the final rule implements only a part of the proposed rule, NMFS's interpretation based on the proposed rule has no deferential value. "Agency interpretations are entitled to respect to the extent that those interpretations have the power to persuade." *United States v. R & F Properties of Lake Cnty., Inc.,* 433 F.3d 1349, 1357 (11th Cir.2005) (internal citations and quotations omitted); *see also Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)); *Arriaga v. Fla. Pac. Farms, L.L.C.,* 305 F.3d 1228, 1238 (11th Cir.2002) (recognizing that *Skidmore* standard applicable to courts when considering the deference to be accorded to agency rulings, interpretations and opinions, dictates that the "weight of such [an agency] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"). Deference to an agency interpretation is all the more appropriate when it concerns a complex and highly technical regulatory program "in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Sarasota Mem'l Hosp. v. Shalala,* 60 F.3d 1507, 1511 (11th Cir.1995) (citations and internal quotation omitted); *accord Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 1002–03, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (reaffirming the principle of judicial deference to agency interpretations on questions involving subject matter that is technical, complex, and dynamic, because the agency is in a far better position to address such questions than the courts are). "An agency's expertise is superior to that of a court when a dispute centers on whether a particular regulation is 'reason-

ably necessary to effectuate any of the provisions or to accomplish any of the purposes' of the Act the agency is charged with enforcing; the agency's position, in such circumstances, is therefore due substantial deference." *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 845, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).

Georgia Aquarium implies that the replacement take provision in the Proposed Rule was altered due to "substantial changes to the public display provisions of the [MMPA], eliminating the basis for many of the provisions that had been included in the proposed rule." (Doc. 55-1 at 44.) According to NMFS, however,

> The unimplemented parts of the proposed rule are not relevant here and mainly concerned captive marine mammal maintenance. *Compare* 1993 Proposed Rule, 58 Fed.Reg. at 53,346-47 ('captive maintenance' provisions at Section 216.37) *with* 1996 Final Rule, 61 Fed.Reg. at 21,935-36 (omitting those provisions). This change was necessary because the 1994 MMPA amendments removed NMFS' jurisdiction over captive maintenance and transferred it to the U.S. Department of Agriculture. *See* MMPA Annual Report, January 1, 1994 to December 31, 1994, at 1 (noting the 'elimination of NMFS jurisdiction over the care and maintenance of captive marine mammals held for public display').

(Doc. 59-1 at 46, n. 14.) As the permit issuance criteria apply to all types of permit requests under the MMPA, not just public display permits, Georgia Aquarium's suggestion that the "replacement take" language was intentionally removed as part of some overhaul of the public display provisions is unfounded.[43]

The cases Georgia Aquarium relies on for the proposition that NMFS cannot rely on the 1993 Proposed Rule because "a proposed regulation does not represent an agency's considered interpretation of its statute" do not squarely address the issue before this Court or control here. (Doc. 55-1 at 44.) That issue is whether an agency can look to a proposed rule for guidance in interpreting its regulations. For example, in *Commodity Futures Trading Comm'n v. Schor,* the D.C. Circuit declined to defer to the CFTC's interpretation of its authority to administer a reparations procedure for alleged violations of the Commodity Exchange Act "CEA" or CFTC regulations. 478 U.S. 833, 836-45, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). Specifically, the court declined to defer to the CFTC's position that it has jurisdiction over all counterclaims, not just those arising under the CEA or the CFTC, in part, because, the CFTC had proposed a rule permitting jurisdiction over a narrower set of counterclaims and thus "the Commission had not maintained a consistent position on the scope of its authority to adjudicate counterclaims." *Id.* at 844, 106 S.Ct. 3245. The Supreme Court disagreed, and found that,

> it goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound. Indeed, it would be antithetical to the purposes of the notice and comment provisions of the Administra-

43. Georgia Aquarium and NMFS each cite to a transcript of an "on-the-record discussion" between members of the public display community and certain agency representatives discussing the proposed amendments to the MMPA as support for each of their positions. As there is no indication that this discussion is part of the official "legislative" history surrounding the promulgation and revision of the regulations, the Court is not considering it here.

tive Procedure Act, 5 U.S.C. § 553, to tax an agency with 'inconsistency' whenever it circulates a proposal that it has not firmly decided to put into effect and that it subsequently reconsiders in response to public comment.

*Id.* at 845, 106 S.Ct. 3245. In Schor, the CFTC never actually adopted or implemented an interpretation restricting its authority to adjudicate common law counterclaims, meaning it never varied from its promulgated counterclaim rule in form or in practice.

Georgia Aquarium similarly relies on *Clay v. Johnson* for the assertion that "a proposed regulation does not represent an agency's considered interpretation of its statute, and therefore is not entitled to deference." 264 F.3d 744, 750 (7th Cir. 2001). *Clay* involved the effect of the promulgation of a new rule by the Board of Governors of the Federal Reserve System and whether the rule was intended to change the existing substantive law (and thus could not be applied retroactively) or whether the rule was intended to "simply clarify[ ] an unsettled or confusing area of the law, ... but restates what the law according to the agency is and has always been." *Id.* at 749. The district court in *Clay* found that (1) "the position the Board announced in its proposed version of [the rule] was patently inconsistent with the position the Board announced in the adopted version of [the rule]," (2) "it was incongruous for the Board to characterize both of [its] positions as a clarification of the existing law," and (3) "two such contradictory statements could [not] both be clarifications." *Id.* As a result, the district court determined that the adopted rule was a change in the law that could not have a retroactive effect. On appeal, the Seventh Circuit disagreed with the district court's assessment in light of *Schor*, where the Supreme Court "has explained that inconsistencies between an agency's proposed rule and a later-adopted rule are not a valid basis for refusing to defer to an agency's official interpretation of a statute it administers." *Id.* at 749–50 (holding that "the Board's retraction of its initial position is not sufficient to tax the Board with inconsistency.")

Thus, neither *Schor* nor *Clay* pronounce a general rule regarding the propriety of an agency's reliance on omitted language from a proposed rule in interpreting its existing regulations. Indeed, an agency's position, even if only presented in a proposed rule, "warrants respectful consideration" if it's position is consistent with the statute the agency is charged with implementing. *See Wis. Dept. of Health & Family Servs. v. Blumer,* 534 U.S. 473, 497, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002) (finding that Secretary's interpretation of Medicaid law, based on proposed rule, was entitled to deference).

Nor do these cases resolve the question presented here—whether an agency's interpretation of its regulation, based in part on the language of a proposed rule, may be reasonable if the two rules are not inconsistent or contradictory. There is nothing inconsistent between a rule that provides that "the import will not likely result in the taking of marine mammals [ ] beyond those authorized by the permit" and a rule that sets forth an example of that requirement that "the import ... is not likely to result in replacement takes or otherwise increase demand for protected species ... resulting in takes to meet such anticipated demand." The Court does not view the replacement take example as an expansion of the final rule or a substantive change to the scope of the regulation as promulgated. Thus, NMFS's interpretation based, in part, on the language of the 1993 Proposed Rule is not *per se* arbitrary and capricious. Even without the parenthetical explanation in the proposed rule, NMFS's interpretation of "replacement

takes" as takes that are "beyond those authorized by the permit," is consistent with the language of the regulation and the precautionary purpose of the MMPA.

Finally, NMFS argues that its interpretation is consistent with prior permit approvals where the Agency relied on written assurance from the foreign shipping facility that it would not replace the imported animals with substitute animals of the same species.[44] NMFS's three prior permit approvals support its assertion that the Agency has long interpreted 50 C.F.R. § 216.34(a)(7) to require permit applicants to secure these assurances from the exporting facility. In fact, in the examples cited, such assurances were provided.

For these reasons, this Court finds that the Agency's interpretation is not plainly erroneous or inconsistent with 50 C.F.R. § 216.34(a)(7). Accordingly, the Agency's interpretation of its own regulation is entitled to deference.

### C. NMFS's determination that granting the permit would likely result in replacement takes was not arbitrary and capricious

Georgia Aquarium contests NMFS's determination its import permit would likely result in replacement takes on two grounds: (1) that there is no causal connection between granting the Aquarium's permit and Russia's continued acquisition of beluga whales, and (2) that the Agency applied the wrong evidentiary standard when ruling on the Aquarium's permit application.

First, Georgia Aquarium argues that 50 C.F.R. § 216.34(a)(7) requires a causal connection between the issuance of the permit and additional takes. Therefore, the crux of Georgia Aquarium's argument is that the permit will not "result in the taking of marine mammals ... beyond those authorized by the permit" because Russia will continue to collect beluga whales from the wild regardless of the permit's outcome. (Doc. 55–1 at 42.) In fact, according to Georgia Aquarium, its "proposed import will actually prevent future collections from the wild" and will decrease demand for beluga whales in the U.S. because the import allows for a captive, self-sustaining U.S. population via the breeding cooperative. (*Id.* at 41, 50.) NMFS contends that even if Georgia Aquarium's argument is true, *i.e.*, that U.S. imports of beluga whales will actually decrease, "it would only mean that U.S. facilities will not seek to import more belugas from the stock. It does not mean the foreign shipper will not obtain more belugas from the stock to replace those shipped to the U.S. in order to supply facilities in other countries." (Doc. 59–1 at 51.)

Georgia Aquarium has cited no authority for its assertion that the Agency must provide proof akin to proximate cause when it is the permit applicant's burden to demonstrate it has satisfied the statutory and regulatory issuance criteria for special exception permits. In addressing the question of causation in the context of the standing of environmental groups to chal-

44. The Aquarium insists that NMFS cannot rely on prior permit decisions as support for its denial because "each permit application is evaluated on its own merits" and because "issuance of a permit ... does not in any way guarantee or imply that [the Agency] would authorize [others] to conduct the same or a similar activity." (Doc. 83 at 40.) It appears to the Court that Georgia Aquarium misunderstands NMFS's point—which is to demonstrate that its interpretation of the regulation is consistent with its past practice and policy. "In fact, NMFS goes on to state that this case is somewhat different from the prior permit applications because the ongoing, legal marine mammal capture operation in Russia is expected to continue," such that the assurance that NMFS has required in the past as a condition to the granting of the permit was unlikely.

lenge the agency's decision to waive the MMPA's moratorium, the D.C. Circuit in *Kreps* held that:

> We believe that Congress, in enacting the MMPA, established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices. The MMPA addresses not only the killing of marine mammals by Americans but also the importation of them. This reflects a congressional decision that denial of import privileges is an effective method of protecting marine mammals in other parts of the world. This conclusion is supported by the legislative history. In the face of this congressional determination, it is impossible to conclude, as appellees urge us to, that the causal relationship is "purely speculative."

561 F.2d at 1010, 1010 at n. 40 (citing S.Rep. No. 863, supra note 17, at 11, and referencing the Senate committee's consideration "that the adoption of this bill will place the United States in a position of world leadership in protection and conservation of marine mammals. The committee wishes to emphasize the need for international cooperation").

In response, NMFS asserts that it did not find that the permit would create a foreign market or worldwide demand for belugas, as the Aquarium claims. NMFS instead found only that it was likely that the permit would result in the taking of additional belugas from the Sakhalin–Amur stock and therefore required assurance that the shipper will not take additional belugas to replace those shipped to the U.S. The Court finds that the administrative record before NMFS adequately demonstrates the high likelihood that if the 18 beluga whales are imported to the U.S., the ongoing Russian capture operation—the sole global supplier of beluga whales—will replenish its inventory with additional captures. Russia has exported at least 237 beluga whales between 1990 and 2010 and the existing quotas for live-capture exceed the 18 whales subject to this permit. (AR 8998 at 17444; AR 8915 at 13784.)[45]

Georgia Aquarium's final argument—that NMFS applied the wrong evidentiary standard—is a red herring. 50 C.F.R. § 216.34(a)(7) requires a permit applicant to show that "[a]ny requested import or export will not **likely** result in the taking of marine mammals or marine mammal parts beyond those authorized by the permit" (emphasis added). The Aquarium asserts that NMFS stated only that it was merely **"possible"** that Russia would capture and remove an additional 18 whales as a result of the permit; not "likely," as the statute requires. (Doc. 55–1 at 46–47 (citing A.R. Doc. 8999 at 17479 stating "If the 18 whales ... in Russia were imported to U.S. public display facilities, it is **possible** an additional 18 whales would be captured and removed from the same wild population to meet demands of public display facilities outside the U.S.")) (emphasis added). However, as NMFS expressly stated elsewhere throughout its decision:

(1) "[i]n fact, additional beluga whales are **likely** to be captured as part of the ongoing, legal marine mammal capture operation in Russia," (AR 8998 at 17424) (emphasis added)[46]; and

45. The Court will not consider extra-record evidence provided by Intervenors and Amici of an increase in additional live-capture from the Sakhalin–Amur stock that took place after the submission of this permit to NMFS. "[T]the focal point for judicial review of an administrative agency's action should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

46. Intervenors point to a letter from the Utrish Dolphinarium Ltd.'s Director, Dr. Lev Mukhametov, representing that, if the pro-

"[w]e have determined that the requested import will **likely** result in the taking of marine mammals beyond those authorized by the permit," (AR 8998 at 17440) (emphasis added).

Accordingly, the Court finds that NMFS considered and applied the correct standard under 50 C.F.R. § 216.34(a)(7) to Georgia Aquarium's import permit application.

**III. NMFS's finding that Georgia Aquarium failed to show that the beluga whales proposed for import were not nursing at the time of capture was not arbitrary and capricious**

Both the statutory text of the MMPA and its regulations prohibit the import for public display of any juvenile marine mammal which was "nursing at the time of taking." 16 U.S.C. § 1372(b)(2); 50 C.F.R. § 216.12(c)(2). Despite this express statutory prohibition, Georgia Aquarium's permit application does not directly address whether any of the juvenile whales were nursing at the time of capture. Instead, Georgia Aquarium's application included the estimated ages of the whales at the time of collection and noted that "[w]hen a group of belugas was detected, the collection team conducted an initial visual assessment using binoculars to estimate the number and age of the animals present, and to identify the presence of any newborn calves, mother-calf pairs, or juveniles less than one year old." (AR 8927 at 14286, Table 1; AR 8927 at 14292.) Five of the eighteen whales were estimated to be 1.5 years of age at the time of collection. (AR 8927 at 14286, Table 1.)

NMFS denied Georgia Aquarium's permit, in part, because of its finding that Georgia Aquarium had failed to demonstrate that none of the 18 whales were nursing juveniles at the time of their capture. In its appeal, Georgia Aquarium asserts that in denying the permit, "Defendants erroneously concluded 5 of the 18 belugas were nursing when collected, even though no mother-calf pairs or lactating females were collected and even though Defendants have no evidence of any nursing behavior." (Doc. 55–1 at 10.)

In its permit denial, NMFS interpreted the MMPA's statutory and regulatory prohibition on the taking of nursing mammals as requiring a consideration of whether "a calf is fully dependent on its mother for survival, or if it is a broader concept in that while the calf is in the process of becoming independent, it is still occasionally nursing from its mother." (AR 8998 at 17425.) Because it is "difficult to visually determine when an animal is fully independent" from its mother, NMFS reasoned it was consistent with the intent of the MMPA to restrict importation only "to those individuals that were taken after such time that they were considered to be independent of their mothers." (*Id.* at 17425–26.)

NMFS relied on scientific literature that "beluga calves are nursed for two years and may continue to associate with their mothers for a considerable time thereafter [and that] [t]he calving interval probably averages three years." (AR 8998 at 17426) (citing Reeves et al. 2002 (AR 8923)). According to the Aquarium's permit application, 5 of the 18 belugas were estimated to be only 1.5 years old at the time of capture. (AR 8927 at 14286.) As

posed import does not occur, "[m]ost likely, these beluga whales will be sold to the [o]ceanariums of China," as an admission that the import will likely result in the acquisition of freshly captured Sakhalin–Amur beluga whales to sell to interested buyers. (AR 8927 at 14292.)

NMFS further explained, belugas "appear to be dependent on their mothers for nursing for the first year, when their teeth appear (Katona et al. 1993), at which point they supplement their diets with shrimp and small fishes (Haley 1986)" and that "[c]alves are completely dependent on nursing for a year, supplement mother's milk during the second year with food caught by hunting, and are weaned at age 2." (AR 8998 at 17426 (citing AR 8917 at 13830)). Based on this literature, NMFS concluded that "[a]t 1.5 years of age, beluga whale calves are likely not independent from their mothers" and were likely still nursing for subsistence. (AR 8998 at 17426.) Georgia Aquarium offered nothing to counter NMFS's scientific studies.

According to Georgia Aquarium, even assuming some of the juvenile whales were nursing, the proper standard is whether nursing was obligatory, i.e., necessary for the whale's survival, pursuant to an agency policy adopted in 1975. *See* 40 Fed.Reg. 17845–17486 (April 23, 1975) (stating that nursing "means nursing which is obligatory for the physical health and survival of the nursing animal," based on "Congressional guidance . . . that there should be a distinction. The distinction that was intended was that nursing be obligatory for sustenance and not for psychological purposes" [47]). In *Animal Welfare Inst. v. Kreps*, the D.C. Circuit addressed a challenge to the agency's policy distinction between "obligatory" and "convenience" nursing. 561 F.2d 1002, 1011–12 (D.C.Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978). The court in *Kreps* found that the policy was not consistent with the statutory text or purpose of the MMPA and thus rejected the agency's "use of the obligatory nursing concept to narrow the unambiguous command of the statute" which categorically "bars importation of any animal which was 'nursing at the time of taking.' " [48] *Id.* at 1012 (noting that the legislative history suggests that "nursing seems to have been used as a measure of infancy, of vulnerability and helplessness" to respond to "emotional concerns" about "cruel" treatment, and "there is clearly no justification for [any] technical distinction between obligatory and convenience nursing" [49]). The Court therefore finds that NMFS's interpretation of § 1372(b)(2), relying on scientific literature to determine how long and under what circumstances this marine mammal species continues to nurse from its mother until it reaches full independence, is consistent with the MMPA's clear nursing prohibition.

Ignoring the scientific literature supporting NMFS's determination, Georgia Aquarium asserts that NMFS has no evidence that five of the juvenile whales were actually nursing at the time of collection.[50]

47. The Marine Mammal Commission characterized this distinction as an "empty one" with "no rational scientific basis." 40 Fed. Reg. 17845, 17846 (Apr. 23, 1975).

48. Georgia Aquarium's argument that *Kreps* is inapplicable because it dealt with the lethal taking of baby seals does not hold water.

49. Had it not been enacted a few years prior to the song's release in 1980, the Court could imagine the drafters of the MMPA as being inspired by the lyrics of Raffi's Baby Beluga—"Baby beluga in the deep blue sea, Swim so wild and you swim so free. Heaven above and the sea below, And a little white whale on the go. Baby beluga, oh, baby beluga, Is the water warm? Is your mama home with you, so happy?"

50. NMFS rejected Georgia Aquarium's contention that "only animals in human care can be observed for a definite termination of when mother-calf dependency ends" and "that juvenile beluga whales can be independent by 1.5 years of age." Instead, NMFS reasoned that "[w]hile some beluga whales may be independent at this age, it doesn't logically follow that every individual will be and we cannot assume that all 1.5 year olds are independent from their mothers." (AR 8998 at 17426.)

Yet again, Georgia Aquarium seeks to place the burden of proving compliance with the MMPA's permit requirements on NMFS, a common theme in this administrative appeal. Georgia Aquarium asserts that contrary to NMFS's determination, its application complies with this requirement because "no mother-calf pairs and no lactating females were collected. Absent a mother-calf pair and a lactating female, there can be no nursing juvenile." (Doc. 55–1 at 51.) On the simplest level, this is not the same as demonstrating that no whales who were actually still nursing or still of nursing age were not captured. In response, NMFS asserts that this argument makes no sense because beluga calves easily could have become separated from their mothers by the capture operation and thus there would be no "mother-calf" pair in the collected animals. Georgia Aquarium does not dispute that calves of nursing age were approached and collected (their permit only states that no calves less than one year old were targeted). Thus, despite Georgia Aquarium's indication that the capture operation did not engage groups with mother-calf pairs, the procedure used would not have prevented the capture of calves that were physically apart from or not observed with their mothers at the time of capture. Thus as NMFS points out, "the capture team did approach if the group contained juveniles older than one year, and here the five captured belugas were aged 1.5 years old. The capture procedures used thus did not avoid belugas aged between 1 and 2 that NMFS found likely still rely in part on their mothers' milk for food." (Doc. 86 at 34.)

As further support for its position, Georgia Aquarium contends that the record demonstrates that each of the five juveniles took food immediately after capture for 100% of their nutritional needs, and therefore, any nursing was not obligatory. The record actually indicates, as stated in Georgia Aquarium's application, that "[w]hile in the shore-side pens, the whales were fed locally caught herring and Icelandic capelin. In each case noted, the whales began taking food no later than the second day after collection, which is earlier than the typical normalization period for belugas." (AR 8927 at 14380.) Under the MMPA, however, the question is whether the juveniles were "nursing at the time of taking," not at some point after capture and removal from the wild. 16 U.S.C. § 1372(b)(2) (emphasis added).

In addition to the scientific support for its determination that the five belugas captured at 1.5 [51] years of age likely were not independent of their mothers for sustenance, NMFS also found that certain deficiencies in the permit warranted denial:

> We asked the Aquarium why some of the estimated ages of animals proposed for importation had changed (increased) from the preliminary draft application to the submitted application and requested that they clarify the process for estimating the ages. The Aquarium responded that the preliminary draft had a few typographical errors and a very limited amount of information that had not yet been fully updated or was in the process of being reviewed. They indicated that ages were estimated using standard methodologies, which included morphometries (length, girth, fluke sizes), skin

51. NMFS also noted that:

> The Aquarium contends in their response to comments on this subject that the animals proposed for import have age ranges, and that 1.5 years is the bottom of that range. A table was provided in the application which included the estimated age of each animal at time of collection and as of January 1, 2012. These ages were not provided as a range.

(AR 8998 at 17425–17426.)

color, tooth emergence, and behavior; however, they did not provide specific details regarding those methodologies. Of the 18 animals listed in the application eight of them had differences in estimated ages from the preliminary draft application to the submitted application, all increasing in estimated age by a year. In the submitted application, five animals were estimated to be 1.5 years old at the time of capture, all of which were captured in 2010. For two of these animals, the Aquarium estimated their age to be 2.5 years in January 2012 in the preliminary draft application, which would mean that in 2010 (at time of capture) they were approximately one year old. The estimated age for these two animals was increased to 3.5 years in the submitted application. This provides for ambiguity regarding whether these two animals were potentially younger than the estimated 1.5 years old at the time of collection listed in the submitted application based on the information provided in the preliminary draft application. In general, this raises questions about the accuracy of the estimated age at collection of the animals proposed to be imported.

(AR 8998 at 17425–17426.)

In light of the plain language of the statute and the clear intent of the MMPA's prohibition to protect nursing animals in the wild, the Court finds that NMFS's determination was not arbitrary and capricious.

## Conclusion

"Man has been involved with mammals of the sea since at least the beginning of recorded history, as sources of food, clothing and even of recreation." House Report No.92–707 on the passage of the Marine Mammal Protection Act, 1972 U.S.C.A.N.N. 4147, 4148. As the legislative history of the MMPA reveals:

> Recent history indicates that man's impact upon marine mammals has ranged from what might be termed malign neglect to virtual genocide. These animals, including whales, porpoises, seals, sea otters, polar bears, manatees and others, have only rarely benefitted from our interest; they have been shot, blown up, clubbed to death, run down by boats, poisoned, and exposed to a multitude of other indignities, all in the interests of profit or recreation, with little or no consideration of the potential impact of these activities on the animal populations involved.

*Id.* at 4144, 4145. Extensive legislative hearings "underscored the hazards and problems to which marine mammals are exposed today," and "[w]hen to these hazards there is added the additional stress of deliberate taking, it becomes clear that many marine mammals may indeed be in urgent need of protection ... Man's taking alone, without these factors, might be tolerated by animal species or populations, but in conjunction with them, it could well prove to be the proverbial straw added to the camel's back." *Id.* at 4147–4148.

At the time of the passage of the Act in 1972, Congress expressly recognized that:

> Given the inadequacy of present knowledge, it is only conjecture—but a case might be made that the failure of some whale stocks to recover in spite of a worldwide ban on their taking which has existed for several years, may be due to just such a combination of factors as these.... In the teeth of this lack of knowledge of specific causes, and of the certain knowledge that these animals are almost all threatened in some way, it seems elementary common sense to the Committee that legislation should be adopted to require that we act conservatively—that no steps should be taken regarding these animals that might

prove to be adverse or even irreversible in their effects until more is known. As far as could be done, we have endeavored to build such a conservative bias into the legislation here presented.

*Id.* The Marine Mammal Protection Act was enacted to change all that and turn the tides in favor of these mammals. *Id.* at 4152 ("It is undeniable that the levels of knowledge of scientists on marine mammals are very low. The situation must be changed, and H.R. 10420 provides a vehicle for doing so.").

Congress endeavored to put teeth into these goals by placing a strict burden on those seeking permits, requiring that any taking allowed under the Act's permit provisions "will not work to the disadvantage of the species or stock," and giving "prime consideration" to the interests of the animals above all others. *Id.* at 4151. The MMPA further "creates a strong regulatory responsibility in the agencies involved, coupled with a Congressional directive that far more adequate knowledge must be developed on what is actually happening to these animals." *Id.*

Thus, the legal soundness of NMFS's decision to deny Georgia Aquarium's permit is clearly echoed in the MMPA's history. Georgia Aquarium bore the heavy burden of showing that it satisfied the necessary criteria for issuance of a permit under the Act and that its requested import was consistent with the statute's clearly stated protective purposes. The Court recognizes that the Aquarium undertook a serious study of the sustainability of the live-capture of the beluga whales in the Sakhalin–Amur region of the Sea of Okhotsk prior to submitting its permit request. And NMFS also undertook a rigorous analysis of the Aquarium's application utilizing its great breadth of experience and scientific expertise. However, NMFS found significant and troubling inconsistencies in Georgia Aquarium's data and uncertainty associated with the available information regarding the abundance and stability of this particular whale population. Faced with the near certainty of ongoing live-captures of a significant number of whales from a stock that is likely depleted from decades of intensive and exploitive hunting, NMFS determined that Georgia Aquarium was unable to show that importing 18 whales for captive breeding and public display would "not work to the disadvantage" of the Sakhalin–Amur stock. (*Id.* at 4151.)

Like something out of a Russian spy novel, in response Georgia Aquarium launched a wholesale attack on NMFS, accusing the Agency of "cooking the books" to fabricate its rationale in a deliberate and conspiratorial effort to deny Georgia Aquarium's import permit. Beyond all the smoke and mirrors, Georgia Aquarium's arguments boil down to an attempt to shift the burden of proof to NMFS. Having carefully reviewed the administrative record in this case and all parties' arguments, the Court finds that NMFS properly reviewed Georgia Aquarium's permit application through the lens of the MMPA's purposes, and gave due consideration to the regulatory issuance criteria designed to ensure that the requested import not allow the Sakhalin–Amur beluga whale stock to "diminish beyond the point at which [it] cease[s] to be a significant functioning element in the ecosystem of which [it is] a part, [and] below [an] optimum sustainable population." 16 U.S.C. §§ 1361(2).

The words of Herman Melville's Ishmael still ring true:

*"Already we are boldly launched upon the deep; but soon we shall be lost in its unshored, harborless immensities.... No branch of Zoology is so much involved as that which is entitled Cetology ... Utter confusion exists among the historians of this animal ... Unfitness*

*to pursue our research in the unfathomable waters. Impenetrable veil covering our knowledge of the cetacean ... Thus speak of the whale ... Nevertheless, though of real knowledge there be little.... As no better man advances to take this matter in hand, I hereupon offer my own poor endeavors. I promise nothing complete; because any human thing supposed to be complete, must for that very reason infallibly be faulty ... But I have swam through the libraries and sailed through oceans; I have had to do with whales with these visible hands; I am in earnest; and I will try."*

Herman Melville Moby–Dick (1851).

Accordingly, the Court **DENIES** Georgia Aquarium's Motion for Summary Judgment [Doc. 55] and **GRANTS** Defendants and Intervenor–Defendants' Motions for Summary Judgment [Doc. 59, 61].[52] The Clerk is **DIRECTED** to close the case.

**IT IS SO ORDERED.**

## APPENDIX A

chenberg, Dr. Jane Goodall, Dr. Denise Herzing, Dr. Janet Mann, Dr. Lori Marino, Edward Norton, Hayden Panettiere, Louie Psihoyos, Fisher Stevens, Bob Talbot, Charles Vinick, Ingrid Visser and Dr. Masha Vorontsova [Doc. 66].

---

**52.** As stated above, the Court also **GRANTS** the Motions for Leave to File Briefs as Amici Curiae by Defenders of Wildlife and The Humane Society of the United States [Doc. 63], and by Kim Basinger, David Blaine, Jean-Michel Cousteau, Gabriela Cowperthwaite, Shannen Doherty, Dr. Sylvia Earle, Tim Ei-